[No. 1144.]

# WILLIAM STINSON, APPELLANT, *v.* W. H. SWEENEY, RESPONDENT.

ELECTION CONTEST—REGISTRY LAW—STRICT CONSTRUCTION.—The provisions of the registry law, when necessary to preserve the purity of elections, should be strictly pursued.    Each elector must be registered, and vote in the election precinct where he resides.

---

Points decided.

---

IDEM—LIBERAL CONSTRUCTION.—Where a non-compliance with the provisions of the registry or election laws, upon the part of the registry agent or officers of the election, are not essential to preserve the purity of elections, and the election is fairly and honestly conducted, the voters should not, on account of such irregularities, be deprived of their votes.

IDEM—APPOINTMENT OF REGISTRY AGENT.—When there is no justice of the peace residing in an election district, it is the duty of the county commissioners to appoint a suitable and competent person to act as registry agent therein, and in remote precincts a non-resident may be appointed.

IDEM—FAILURE OF REGISTRY AGENT TO KEEP OFFICE HOURS—OBJECTIONS TO REGISTRY LIST.—In order to vitiate the election or change the result on the ground of the failure of the registry agent to keep his office within the election district, it must affirmatively appear that there were good and valid objections which could and might have been presented if the officer had complied with the law in this respect.

IDEM—NEW POLLING PLACE AFTER REGISTRY CLOSES—DUTY OF REGISTRY AGENT.—When a new polling place is carved out of the territory of an established election precinct, after all the electors residing therein have been properly registered, it is the duty of the registry agent to prepare a duly certified check list of the electors registered by him, residing within the limits of the new polling place, and deliver the same to the inspectors thereof.

IDEM.—A register was appointed for Cortez precinct. The voters were registered as residing at " Cortez mill" and " Garrison mine." After registration closed a new precinct, or polling place, was established at the Garrison mine. The registry agent made out a check list for each polling place, containing all the names of the voters registered by him in Cortez precinct. The persons who voted at the Garrison mine were registered as residing at that place. The election was fairly and honestly conducted: *Held*, upon a review of all the facts, that the votes cast at the Garrison mine were legal votes, and were properly counted.

IDEM—TRANSFERS, WHEN NOT REQUIRED.—*Held*, that the persons voting at the Garrison mine were not required to procure transfers from the Cortez precinct, because they had not removed therefrom.

IDEM—OATH OF INSPECTORS—RETURN NOT CERTIFIED.—When no question is made as to the right of electors to vote, and no question made as to the correctness of the returns made by the inspectors of election: *Held*, that the failure of inspectors to take the oath of office, and, from thoughtlessness, to certify to the returns, as required by law, would not justify the exclusion of the votes.

NOTICE OF ILLEGAL VOTES TO BE GIVEN.—In an election contest the time of the notice required to be given as to the illegal votes relied upon, must be computed by including the first day and excluding the last, and the notice must be given three days before the trial commences, without regard to the fact whether any evidence is introduced on the first day of the trial.

APPEAL from the District Court of the Sixth Judicial District, Eureka County.

The facts sufficiently appear in the opinion.

*Wren & Cheney,* for Appellant:

I. One of the main objects "intended to be secured by the registration act of this state (2 Comp. Laws, 2701, 2702, 2704, 2705, 2713 and 2714) and by sections 14 and 24 of the act "relating to elections" (2 Comp. Laws, 2517, 2527), was the prevention of repeating. The legislature intended to provide for the division of townships into election districts or precincts, and for the registration of the voters in the election district or precinct in which they reside respectively. (2 Comp. Laws, 2700, 3711.)

II. It was the intention of the legislature, in carrying out the provisions of section 6 of article II. of the constitution, and to prevent fraud, to require every elector, in order to become entitled to vote, to have his name entered upon the official register of the election district or precinct in which he resides and in which he desires to vote, and in no other, and to require inspectors of election to have before them, when receiving votes, a copy of the register of voters and a check list for the precinct or district for which they are inspectors. These requirements are mandatory and not merely directory. The inspectors of election of the Garrison mine precinct were guilty of mal-conduct in opening polls at the Garrison mine, and receiving votes without having a copy of a register of voters or check list for said precinct "before them." They were guilty of mal-conduct in opening polls at the Garrison mine and using a copy of the register of voters and check list for the Cortez precinct, at said Garrison mine precinct, and in receiving the votes of voters thereat, who were registered for the Cortez precinct. They were guilty of mal-conduct in opening polls and receiving the votes of persons at the Garrison mine precinct without having before them a copy of the register of voters and check list made by the registry agent of that precinct for that precinct, and in knowingly receiving the votes of persons not registered in said Garrison mine precinct, or transferred thereto, and in receiving their own votes at said precinct, knowing that they were registered in the Cortez precinct and not in said Garrison mine precinct.

III. In all matters absolutely essential to "preserve the purity of elections," there must be a strict compliance with

the law.  Where the voter himself is in whole or in part
made an agent to carry out the provisions of the registration
or election laws, a much stricter compliance will be required
than in those matters in which the registration or election offi-
cers are entrusted solely with the execution of the law.
(*State* v. *Hilmantel,* 21 Wis. 556; *State* v. *Stumpf,* 23 Wis.
630; *Re Duffy,* 4 Brews., Pa. 531; *People* v. *Canaday,* 73
N. C. 198.)

IV.  Laws providing for the registration of voters are highly
reasonable and useful regulations, calculated to promote peace,
order and purity in elections, and in all matters absolutely
essential to accomplish those ends should be strictly construed.
(*Knowles* v. *Yeates,* 31 Cal. 92; *People* v. *Laine,* 33 Cal. 55;
*People* v. *Kopplekom,* 16 Mich. 342; *Zeiler* v. *Chapman,* 54
Mo. 502; *Nefzger* v. *Davenport,* 36 Iowa 642; *Capen* v. *Fos-
ter,* 12 Pick. 485; *Webster* v. *Byrne,* 34 Cal. 280.)  The
inspectors of election at the Garrison mine precinct were
guilty of mal-conduct.  (*Greeley* v. *Holland,* 14 Nev. 613;
*Knowles* v. *Yeates,* 31 Cal. 92; *Minor* v. *Kidder,* 43 Cal.
236; *Preston* v. *Culbertson,* 58 Cal. 198.)

*Baker & Wines,* for Respondent:

I.  The irregularities complained of by appellant have never
been held sufficient to invalidate an election.  (2 Comp. L.,
2535; *People* v. *Cook,* 8 N. Y. 67; *Case of Elisha Strong,* 20
Pick. 491; *Keller* v. *Chapman,* 34 Cal. 640; *Sprague* v.
*Norway,* 31 Cal. 176; *Borland* v. *Hildreth,* 26 Cal. 214;
*People* v. *Seaman,* 5 Den. 412; *People* v. *Pease,* 27 N. Y.
55–72; *Howard* v. *Shields,* 16 Ohio St. 184; *Carpenter* v.
*Ely,* 4 Wis. 420; *People* v. *Vail,* 20 Wen. 12.)

II.  This proceeding is instituted under the first sub-division
of section 2540, Comp. L., depending upon mal-conduct upon
the part of the election inspectors at the Garrison mine pre-
cinct.   Under the statute the inquiry cannot be extended
beyond the action of the board of inspectors, and not to the
regularity of the acts of any other officers connected with the
conduct of the election.   In other words, if the regularity of
organizing a precinct by the board of county commissioners,
or the unauthorized acts of a registry agent, are relied upon

to set aside the election, then the action must be in the nature of a writ of *quo warranto*, and not a contest; under this section of the statute.

III. Misfeasance or malfeasance upon the part of a registry agent cannot amount to mal-conduct upon the part of election inspectors, for the reason that they can in no manner control his actions, and have no discretion in receiving the votes of electors whose names appear upon the list furnished by the agent. (2 Comp. L., 9517; *Capen* v. *Foster*, 12 Pick. 485.)

IV. The votes cast at the Garrison mine were legal. The objections made by the plaintiff to these votes are more formal than substantial, more imaginary than real, and as a legal proposition the registry acts as well as the election laws, where no fraud is shown, are held by the courts directory merely. (*People Ex Rel. Frost* v. *Wilson*, 62 N. Y. 186.)

By the Court, HAWLEY, C. J.:

This is an election contest. At the general election held on the seventh of November, 1882, Stinson and Sweeney were opposing candidates for the office of sheriff of Eureka county. Stinson received eight hundred and ninety-one votes. Sweeney received eight hundred and ninety-five votes. This was the official count as declared by the board of county commissioners. At the Garrison mine precinct Stinson received two votes. Sweeney received eight votes. It is claimed by appellant that these votes should not have been counted. If they are excluded, Stinson would have a majority and would be entitled to the office.

The facts relating to this precinct, as found by the district court, are as follows: In 1874 the "Cortez" election precinct was established and comprised the residents at the Cortez mill and at the Garrison mine. These places were more than eight miles apart.

In 1882, good cause appearing therefor, the board of county commissioners appointed James W. Smith, a resident of the town of Eureka, registry agent for the Cortez precinct. Between the tenth and fifteenth of October he duly registered all the voters of said precinct, except one, who could not be found.

No person was registered except actual residents and qualified voters. The residents of the voters were respectively designated as at the Cortez mill and at the Garrison mine.

On the seventeenth of October, after the registry agent had completed the registration of voters in the Cortez precinct and left the district, the board of county commissioners, upon the petition of ten qualified electors of Eureka county, established and set off from the territory hitherto included in the Cortez precinct a polling place at the Garrison mine, to be known as the Garrison mine precinct, for the convenience of the registered voters residing at said mine, and appointed inspectors of election for said precinct.

No registry agent was appointed for the Garrison mine precinct. No voters were registered for said precinct, and no voters, except one, transferred to said precinct, but the registry agent for Cortez precinct made out and furnished to the inspectors of election at the Garrison mine precinct, or polling place, a copy of his registration list for Cortez precinct, which included the registered voters at the Garrison mine and at the Cortez mill.

No person offered to vote, or voted, at the Garrison mine precinct except the persons who resided at, and were registered in the Cortez precinct as residing at, the Garrison mine. (There was one person registered at Beowawe who procured a transfer and voted at the Garrison mine precinct; but this person is shown to have voted for Stinson, and the legality of his vote is not involved in this contest.)

The returns from the Garrison mine precinct are regular upon their face. The election was fairly and honestly conducted.

Upon these facts was the board of county commissioners justified in including the votes cast at the Garrison mine, or should these votes have been rejected in the official count?

The constitution of this state requires the legislature to make provision for the registration of electors so as "to preserve the purity of elections." (Art. II. sec. 6.) The provisions of the registry law, when necessary to accomplish this purpose, should be strictly pursued.

Under the provisions of the registry law of this state, no

person can vote unless he has been registered. Each elector must vote in the town, ward or election precinct where he resides. These are mandatory provisions that must be complied with. (*Zeiler* v. *Chapman*, 54 Mo. 505; *State* v. *Hilmantel*, 21 Wis. 566; *State* v. *Stumpf*, 23 Wis. 632.)

In other respects where a non-compliance with the provisions of the registry or election laws, upon the part of the registry agent or officers of the election, are not essential "to preserve the purity of elections," the courts, recognizing the fact that the will of the people, when fairly expressed, should be the law of the land, have universally declared that the qualified electors should not, on that account, be deprived of their votes.

There being no justice of the peace residing in the Cortez district, the commissioners had the right, and it was their duty, to appoint a suitable and competent person to act as registry agent therein. (Registration Act, sec. 1.)

In remote precincts, where there are but few voters, it would often be difficult, and sometimes impossible, to find a competent person willing to act in this capacity, and as the law does not, in direct terms, require that the registry agent shall be a resident of the district, we think the commissioners were authorized to appoint a non-resident of the election district.

The registry agent was furnished with the books necessary to carry out the provisions of the registry law (section 2.) He properly registered the names of all the electors legally qualified who resided within the territory of the Cortez district. The name of each person was given. The election precinct was designated as "Cortez," the residence of the voters at "Cortez mill" or "Garrison mine." This was sufficient to "enable the officer or person desiring to serve notice of objection to vote to find the same without difficulty." (Sec. 3.)

The names of the electors registered in the Cortez district, including those registered at the Garrison mine, were properly listed, and notice thereof given by the registry agent, as required by section 8.

The law contemplates that the registry agent shall have an office, and keep office hours, within his election district. (Sec. 8.)

In cities or towns, or at other election precincts where a large number of electors reside, this provision of the law becomes important, and certainly ought to be complied with, so as to enable persons to make objections, if any they have, to the list of names registered. But this question becomes unimportant upon the facts of this case, and is not specially relied upon. There is no evidence that any objections existed against any of the persons who voted at the Garrison mine, or that any objections could, or would, have been made, or the result of the election changed if the registry agent had been present after the registration was closed, and kept his office within the election district. On the other hand, it does affirmatively appear that each person who voted was a qualified elector and legally entitled to be registered. We are of opinion that, in order to vitiate the election, or change the result, on the ground of the failure of the registry agent to keep his office within the election district, it must in some manner. affirmatively appear that there were valid objections that could, and might, have been presented if the officer had complied with the law in this respect.

It was the duty of the county commissioners, under the provisions of section 2 of the "act relating to elections" (2 Comp. L., 2505), when deemed necessary, "to set off and establish election precincts," upon the petition of ten, or more, qualified electors. If a new polling place is carved out of the territory of an established election precinct, after all the electors residing therein have been properly registered, we are of opinion that the proper course to be pursued by the registry agent, in the absence of any statute governing the case, is to prepare a duly certified "check list" of all the electors registered by him residing within the limits of the new polling place, and to deliver the same to the duly appointed inspectors thereof. In the present case it was the duty of the registry agent, after the Garrison mine precinct was established, to make out and deliver to the inspectors at the "Cortez mill" polling place a check list of the names of all the electors registered by him in the Cortez precinct having their residence at the Cortez mill, and to make out and deliver to the inspectors at the "Garrison mine" polling place

the names of all the electors registered by him in the Cortez precinct having their residence at the Garrison mine.    Instead of pursuing this course, the registry agent made out a check list for each polling place, containing all the names of the electors registered by him in the Cortez precinct; but the persons who voted at the Garrison mine were all registered as having their residence at that place, and the result was the same as if the other course had been pursued.

The establishment of a polling place at the Garrison mine was, in all respects, regular.   The inspectors were legally appointed by the proper authorities.   The electors residing at the Garrison mine had been duly registered in the Cortez precinct, and were legally entitled to vote at the new polling place carved out of the territory hitherto included in said precinct.   They were not required to procure transfers from the Cortez precinct, because they had not removed therefrom. They still resided at the same place where they were registered.

It is only in cases where the registered elector moves away from one election district to another that the registry agent is authorized to give the certificate provided for in section 10.

The inspectors at the Garrison mine precinct were not guilty of any malconduct in receiving the votes of the persons registered in the Cortez precinct who resided at the mine.

The voters at the Garrison mine acted in good faith, believing, as they had the right to believe, that they were regularly registered, and that, inasmuch as a new precinct had been created, at their request, for their convenience, and inspectors appointed therefor, that they had a right to vote without any further action on their part.   They were not responsible for the irregularity in the manner of making the "check list" for said precinct.   They were not chargeable with the execution of this duty, or with any notice as to the manner of its performance.   Their names were on the list, and they could not be deprived of their votes because the list also contained the names of other persons, residing at the Cortez mill, who were not entitled to vote at the Garrison mine, or because their own names appeared on the check list at the Cortez mill, where they did not vote.

The cases cited by appellant (*State* v. *Hilmantel*, 21 Wis.

566; *State* v. *Stumpf*, 23 Wis. 632) to show that the voters were themselves at fault, have no application to the facts of this case. There the voters were not registered, and they went to the polls on election day, with full knowledge of this fact and voted without making the proofs required by the law of that state.

In Wisconsin the registry law gives an elector whose name is not registered the right to vote by making an affidavit and presenting certain proofs at the time of the election.

The inspectors of election are created a board of registry. In other respects the law contains provisions similar to the law of this state.

In *Wood* v. *Baker*, 38 Wis. 71, it appeared that in the second ward of Grand Rapids the inspectors met as a board of registry, and made a duplicate list of the names of voters, without their residences, "not certified, filed or posted, as required by law; did not meet again, but used the lists so made at the election as a register of the voters." In none of the wards of Centralia was there any meeting of the inspectors as boards of registry. But a few days before the election some of the inspectors from each ward had a meeting, and made lists of the names of voters for each ward, "without their residences, not arranged alphabetically, certified, filed or posted, as required by law, but used by the inspectors at the election as registers of the voters."

Persons whose names were on these five lists, respectively, were permitted by the inspectors to vote, and voted in their respective wards at the election, without oath or proof required from non-registered voters, precisely as if the lists had been regular and valid registers of the voters, duly made, certified, filed and posted, as required by law. In that case there was no suggestion from the evidence "that any persons, not otherwise legal voters in their respective wards, voted in them at the election."

Ryan, C. J., in delivering the opinion of the court, among other things, said: "It is, of course, quite manifest that the inspectors of election failed in their duties as boards of registry, and that the lists which they used at the election * * * were defective in substance and form, and were not made

by them under color of compliance with the registry law. And the question is whether such official non-feasance and malfeasance of the inspectors of election can operate to disfranchise legal voters, without notice and without fault. We say without notice and without fault, for none appears affirmatively in these cases. And we cannot think that in such circumstances voters are chargeable with constructive notice of the failure of duty by the inspectors, or of the irregular or defective character of the registers *de facto*, used by the inspectors at the election, or in default for not qualifying themselves as non-registered voters, when they find themselves *de facto* registered on actual registers, used as official, regular and valid by the inspectors at the election. * * * If failure or error in duty of the inspectors, of which voters have no notice in fact, could operate, directly or indirectly, to disfranchise voters at the election, we should encounter * * * difficulty in sustaining the statute under the constitution. Non-feasance or malfeasance of public officers could have no effect to impair a personal, vested, constitutional right. We see no such purpose in the registry law. Surely it would be a strange attempt to protect the elective franchise and preserve the purity of elections, to put it in the power of inspectors of election, by careless accident or corrupt design, to disfranchise constitutional voters. That, we take it, would be the actual effect of avoiding elections where the inspectors use defective or irregular registers at the election as official and valid, so entrapping voters into dispensing with proof of their right, required and authorized only when their names are not registered at the election. We cannot think that such is a necessary or admissible construction of the statute. * * *

"It was said upon the argument that the voters whose names were on the registers in the several wards in question were bound to inspect the registers and to discover their apparent defects. We cannot think so. * * * They may accept the registers *de facto*, as they accept the inspectors *de facto*. And they are no more bound to inquire into the qualifications *de jure* of the registers than into the qualifications *de jure* of the inspectors. It is enough for voters to find at the election acting inspectors using actual registers *virtute*

*officii.* They need look no further to see if their votes be
challenged by statute. The statute cannot challenge them
without notice. Their constitutional right cannot be baffled
by latent official failure or defect. And the registry law sets
no such trap—authorizes none such for the constitutional right
which it was passed to protect. In these five wards there
were registers *de facto* of the voters, used by the inspectors at
the election, as official and valid under the law. The voters
whose names were on them do not appear to have had any
notice of irregularities or defects in them. They appear to
have come to the polls to vote, and to have voted in good
faith, without any sort of warning that proof of their right
to vote was required by law. The facts are wholly unlike
those in the case of Hilmantel and Stumpf. It would be a
fraud on the constitution to hold them disfranchised without
notice or fault. They went to the election clothed with a con-
stitutional right, of which no statute could strip them with-
out some voluntary failure on their own part to furnish statu-
tory proof of right. And it would be monstrous for us to
give such an effect to the registry law against its own spirit
and in violation of the letter and spirit of the constitution.
The votes cast in these wards should, therefore, be counted in
the election."

The true doctrine relative to contests of this character is
very clearly announced by the court in the contested election
of E. R. Wheelock, 82 Penn. St. 299: "An election is the
embodiment of the popular will, the expression of the sover-
eign power of the people. When the application of technical
rules and a strict construction of the acts of the officers, in
preparing the election papers and conducting an election,
would tend to defeat the will of the people and change the
result of an election for an important office, they should not
be applied, and all reasonable amendments should be made in
favor of the legality of their proceedings. When, however,
it is alleged that there is actual fraud in the election, or that
the ballot-box has been tampered with, or illegal votes received,
or the careless or fraudulent acts of the officers have mixed or
confused the ballots, the duty of the court is equally plain,
and every legal facility should be afforded to purge the poll."

Upon a review of all the facts, and after a careful examination of all the authorities cited by the respective counsel, we are of opinion that the votes cast at the Garrison mine were legal votes, and that they were properly received and counted by the county commissioners.

The record in this case also calls in question the validity of the count made by the board of county commissioners of the votes cast at "Devil's Gate," "Allison's Ranch" and "Robert's Creek," where the inspectors did not take the oath of office, and, "from thoughtlessness," failed to certify to the returns as required by law.

No question was made as to the right of the electors to vote in these precincts; and no question is raised as to the correctness of the returns. The objections urged against counting the votes from these precincts are without merit.

"There is no pretense that by reason of these irregularities any illegal votes were cast for the respondent, * * * or that the contestant was not allowed in the tally all the votes that were cast for him, or that the respondent was allowed more votes than he was entitled to, or that they contributed in any manner to cause respondent to be declared duly elected. Mere irregularities which do not affect the final result, or, in other words, do not produce a different result from that which would have otherwise happened, are not vicious. Electors cannot be denied the benefit of their votes upon such slender grounds. (Sprague v. Norway, 31 Cal. 173; see, also, Cleland v. Porter, 74 Ill. 78, and the authorities cited by respondent's counsel.)

"The election laws are designed to secure a fair expression by the electors of their choice of public officers. It is of paramount importance, under our system of government, that unqualified persons shall be excluded from the suffrage, and that elections shall be conducted in a way which shall secure public confidence that the results are truly and honestly declared. It is eminently proper that inspectors and boards of registry should act under the sanction of an official oath, and that they should comply with the forms prescribed by statute in conducting elections. They are punishable if they

wilfully omit to do so.   But it often happens that inspectors of election are men unacquainted with the duties of the position and the numerous and sometimes complicated provisions of the election laws.   The statute does not create the right to vote. It exists by force of the constitution, and to defeat the right because election officers failed to qualify or to certify the register, it not being shown that the result was changed by the omission, is, as we have said, against the general tenor of authority.   (*People ex rel. Frost* v. *Wilson,* 62 N. Y. 193.)

We have decided this case upon its merits, without reference to the preliminary question, urged by respondent, that in an election contest like this the regularity of the acts of the board of inspectors could only be called in question, and that the legality of the acts of the registry agent, or other officers, could only be determined in a proceeding in the nature of a writ of *quo warranto.*   We have not examined this question, and do not decide it.

In an election contest the time of the three days' notice required to be given, as to the illegal votes relied upon (2 Comp. L. 2543), must be computed by including the first day and excluding the last.   (*Misch* v. *Mayhew,* 51 Cal. 514.) This notice must be given three days before the trial of the case commences, without regard to the fact whether or not any evidence is introduced on the first day of the trial.

The judgment of the district court is affirmed.