[No. 1436.]

## B. F. LYNIP, CONTESTANT AND RESPONDENT, *v.* L. A. BUCK-NER, CONTESTEE AND APPELLANT.

1—ELECTION CONTEST—APPEAL.—A judgment of the district court in an election contest declaring the election of a candidate whom the official returns showed had been defeated, is not an annulment of an election within the meaning of Gen. Stats., sec. 1569, so as to require the dismissal of an appeal taken more than thirty days after the rendition of the judgment.

2—SAME—NEW TRIALS AND APPEALS.—New trials and appeals in contested election cases are regulated by the civil practice act.

3—AUSTRALIAN BALLOT LAW—BALLOTS.—Where the inspectors of an election failed to remove the strips containing the numbers from the ballots of a precinct before placing them in the ballot box, but it satisfactorily appeared that this was done through an innocent mistake on their part, they supposing that they had removed them, and that the fact that the numbers were being left on the ballots was unknown to the voters, or to any one, until after the close of the polls, and that it consequently was not, and could not have been, used for the purposes of bribery or intimidation: *Held*, that this should not have caused the rejection of the ballots. (BELKNAP, J., dissenting.)

APPEAL from judgment and order overruling motion for new trial, from District Court, Humboldt county; *C. E. Mack*, District Judge, presiding.

The points sufficiently appear in the opinion.

*Thomas E. Haydon* and *Robert M. Clarke*, for Appellant:

Appellant relies on the proposition that the ignorance, mistake, or even fraud, of the members of the election officers (in this case there is not even a pretense of fraud) cannot deprive the voter of his constitutional right to vote and have his vote counted. (*Stinson* v. *Sweeney*, 17 Nev. 310–322.)

Punctuating the inviolability of this constitutional privilege of the lawful voter, after due observance on his part of the requirements of registry and election laws, to cast his vote and have it counted, where there is no delinquency on his part, we cite: *Davis* v. *McKeeby*, 5 Nev. 370; *Clayton* v. *Harris*, 7 Nev. 64; *State* v. *Findley*, 20 Nev. 200.

Section 29 of the Australian ballot law makes it a felony for any public officer to willfully neglect or refuse to perform any duty enjoined on him by the act. Yet, if he does so,

that does not make void the ballots of qualified electors. (McCreary on Elections, sec. 500.)

Very little attention is given to irregularities of election officers. Where only lawful electors are allowed to vote the malconduct of officers will not .make void the votes. (McCreary, sec. 187–205.)

As to the spirit in which the election laws should be construed in favor of the lawful voter, see McCreary, 135, 138, sec. 208, and *Bowers* v. *Smith*, 11 Mo. 45.

This case is on the Australian ballot law and Bristol's Decisions of other courts of last resort, all tending to show that the trial court erred in rejecting the ballots of Rebel Creek, and all tend to show that the decision in *Stinson* v. *Sweeney*, *supra*, though made before the adoption of the · Australian ballot is still the law of the land in this and many other states with similar constitutions.  (17 Col. 338; 31 Am. St. Rep. 304 and note; 130 Ind. 561; 30 Am. St. Rep. 254; 12 Col. 256; 129 N. Y. 395; 102 N. C. 456; 11 Am. St. Rep. 767; 30 Fla. 668; 32 Am. St. Rep. 46; 78 Mich. 545; 18 Am. St. Rep. 458; 146 Pa. St. 592; 28 Am. St. Rep. 814; 53 Kan. 594; 42 Am. St. Rep. 306, 313, 315.)

There are no marks on either of the rejected ballots such· as to furnish any proof or apparent indication that they were placed thereon for the purposes of identification, but they simply show an erasure of a mark or cross inadvertently placed opposite the name of the candidate the voter did not intend to vote for.  (*Ruttledge* v. *Crawford*, 91 Cal. 526; 63 Tex. 390; 51 Am. Rep. 646; 135 N. Y. 522; 12 Col. 256; 92 Cal. 135.)

The burden of proof is always on the contestant of an election to show that he received more lawful votes for the office in question than his opponent, who is declared by the proper canvassing board to have been elected.  (McCreary on Elections, sec. 424.)

The presumption of law is that the board of elections did its duty lawfully and correctly in deciding the number of lawful votes received by each of the contesting candidates and correctly decided which received the majority, and the burden of proof was on the contestant to overcome this *prima facie* case.  (McCreary, sec. 465.)    [Here follows argument on the facts and points not passed upon.]

*David S. Truman,* for Respondent:

After a full hearing upon the merits the lower court found and adjudged that the contestant was duly and legally elected. The contestee, being desirous of having a review of this case, prepared his statement on motion for a new trial and filed the same in the cause. The respondent then asked the court to refuse to allow said statement, on the ground that the statute regulating contests of election does not provide for a new trial motion, but only for an appeal. Thereupon the lower court, after considering the matter fully, determined that there had been no errors sufficient to warrant the granting of a new trial in case a new trial was a proper proceeding in this character of action, and secondly that he had no power or authority under the statutes of this state to grant a new trial at all, and that to do so would be going beyond his jurisdiction in the case.

There are two preliminary motions made by respondent: First—One to dismiss this appeal, and if this motion is well taken, the case must be at an end in this court. Second—In the event that said motion for a dismissal does not prevail, then the motion for a diminution of the record is to be considered, and should this motion prevail, then there is only the judgment roll before this court for its consideration, and in the event that neither motion should prevail, then the appeal, of course, must be determined and considered on the merits.

The court is asked to dismiss the appeal: (1) Because the appeal is not taken in the time required by the statutes governing election contests, and (2) because of the appeal not being taken within thirty days after the rendition of the judgment of the court. (*Steel* v. *Steel,* 1 Nev 27; 7 Nev. 106.)

The intention which is declared by all of the courts that have been called upon to adjudicate on contested election laws is that it is a summary remedy to speedily determine who are the duly elected officers of the people. (*Webster* v. *Byrnes,* 34 Cal. 277; *Keller* v. *Chapman,* 34 Cal. 635; *Minor* v. *Kidder,* 43 Cal. 229–237, in which the court says: "It is, therefore, not an ordinary adversary proceeding, for, as against the high public interest concerned, there can be no recognized adversary.")

Another rule of interpretation applicable here is that where the later statute makes a special provision different from the former, the latter will govern. (*V. & T. R. R. Co. v. Ormsby Co.*, 5 Nev. 341; *Gillette* v. *Sharp*, 7 Nev. 245.)

It must be considered here that if the legislature desired that the practice act relative to appeals should apply where the decision was against the person holding the certificate, it would have added no further provision in the election law changing the provision of such practice act relative to appeals in the case mentioned. (14 Cal. 503.)

The design of the election statute is determined in *Saunders* v. *Haynes*, 13 Cal. 145-151; *Gerrard* v. *Gallagher*, 11 Nev. 386; *Thorpe* v. *Schooling*, 7 Nev. 15; *Arnold* v. *Stevenson*, 2 Nev. 234; 6 Nev. 108; 7 Nev. 19; 24 Cal. 449; 29 Cal. 416.

The district courts of this state have no jurisdiction of election contests by virtue of the general jurisdiction conferred upon them by the constitution or statutes. (Gen. Stats. 2439; Const., art. VI., sec. 6; Gen. Stats., sec. 137.) The jurisdiction is only conferred by the statutes governing election contests. (Gen. Stats., sec. 1563.) Neither the constitution nor the statutes give any right of appeal, in so many words, as our constitution and statutes do, in the state of California. (Code of Civil Procedure, sec. 963; *Knowles* v. *Yates*, 31 Cal. 83.) The position taken by counsel that this is a "case" within the meaning of the constitution and laws of this state is erroneous. (*Dorsey* v. *Barry*, *supra*; Hayne on N. T. & Ap., sec. 172.)

The position also taken by counsel that the word "annulled" as used in sec. 1569, Gen. Stats., means the entire abrogation of a general election, is not sustainable or reasonable when considered in connection with the other sections of the act. This is more clearly shown by reference to section 1561. Section 1560 is also directly contradictory to counsel's contention. See, also, sections 1562, 1567, 1569. Section 1695 does not declare the election shall all be set aside, but that *the office becomes vacant,* * * * and the certificate, if any has been issued, is void.

The foregoing motion failing, there should be a diminution of the record in this case by striking out the statement on motion for a new trial and everything but the judgment roll.

In support of this, see Hayne on N. T. & Ap., sec. 5; *Dorsey* v. *Barry*, 24 Cal. 449; 24 Cal. 457.)

When our legislature so adopted their law and did not make any provision for a new trial being had in these special proceedings, there can be no doubt of the intention of the legislature that there should be no new trial had (2 Nev. 199; 8 Nev. 312; 1 Nev. 533; 5 Nev. 24; 18 Nev. 254–63.)

The action of the lower court on this matter is *coram non judice*, and the same should be stricken from the records of the case because a new trial not being proper no such statement can be of any avail to appellant. It does not purport to be a statement on appeal and cannot be treated as such by the court. (*Robinson* v. *Benson*, 19 Nev. 331; *Nesbitt* v. *Chisholm*, 16 Nev. 40; *Williams* v. *Rice*, 13 Nev. 234.)

There is no error appearing upon the judgment roll, and the repeated decisions of this court are that in such case the judgment appealed from will be affirmed.

When the ballot was given to the voter the number of such ballot was written by the clerk upon the registry list in compliance with section 19 of the act of 1891, p. 44, and all being done in compliance with that and section 20 up to this point everything appears to have been regular and in conformity with law concerning the Rebel Creek precinct. The remaining portion of section 20 regarding the disposition of the ballot and numbered strip being destroyed was not done, and now counsel for the appellant asks this court to declare such a ballot to be legal and to be counted. The lower court was right in excluding such ballots and refusing to count them. To uphold counsel's contention is to destroy the intention of the law, as well as the very language of the statute.

What is the constitutional right of the voter? Certainly, to cast his ballot without the knowledge of any one as to how he has cast it or for whom he has voted. That which destroys the secrecy of the ballot destroys his constitutional right. The leaving of this number upon the ballot, whether done ignorantly, willfully or maliciously by the inspector, is absolutely destructive of this right.

The legislature intended to prevent the counting of a ballot upon which the strip with the number was left and not detached before going into the ballot box, and is evidenced

by the prohibition of section 26 where it is enacted that no ballot with marks printed, except as in the act provided, shall be counted. That this language is mandatory goes without saying. (*Williams* v. *Stein*, 38 Ind. 89.)

Counsel lay some stress on the burden of proof lying with contestant. Originally it did, but when we gave to the court sufficient legal reason for the exclusion of the vote and rested our case, certainly the burden of proof was shifted.

Counsel claim that certain illegal votes were cast at Kennedy precinct. If so, we have made our case, they should have shown that they voted for the respondent. It devolved on them and not on us to do so. (*Littlefield* v. *Newell*, 27 Am. Rep. 156.)

It cannot be successfully claimed that all these votes which are alleged to be illegal should be deducted from respondent's vote in Kennedy precinct. (McCreary on Elections, 2d ed., secs. 298–9, 300; *Ellis* v. *May*, 58 N. W. Rep. 483.)

*Thomas E. Haydon* and *Robert M. Clarke*, for Appellant, in reply:

Respondent took no appeal from the failure of the lower court to dismiss the motion for new trial, nor its failure to refuse the settlement of such statement. Even if the motion for new trial is overruled on the grounds that no motion for new trial lies in a contested election case, yet the statement can be used to review the judgment in the case, and, if any error is thereby disclosed, the judgment will be reversed. (*Towdy* v. *Ellis*, 22 Cal. 630; 17 Cal. 518; 18 Cal. 203; 23 Cal. 530; 25 Cal. 154; 68 Cal. 363; 81 Cal. 399; 83 Cal. 622; 86 Cal. 235.) Compare, also, sec. 340 of our present civil practice act and sec. 284 of the practice act of the territory of Nevada (Stats. 1861, p. 363); sec. 346 of the California practice act and section 950 of the California code of civil procedure of 1874.

The court will perceive that the question of the validity of the ballots cast at Rebel Creek can be legitimately raised upon the demurrer to respondent's amended complaint as a matter of law, also upon the opinion and decision of the judge as a matter of fact. But the attorney of appellant by no means abandons his position that appellant has all the rights and remedies under the civil practice act that any liti-

gant has in any other action. In all cases of contested elections for county or township officers the district courts of the respective districts have original jurisdiction to try and determine such cases. (Gen. Stats., sec. 1563.)

Where the district court has jurisdiction to try and determine a case in the first instance, the supreme court has jurisdiction to review its decision on appeal. (*Klein* v. *Allenbach*, 6 Nev. 162.)

The complaint in ordinary actions and the statement in an election case is the test of jurisdiction of the district court below and in the supreme court on appeal. Section 330 of the practice act (Gen. Stats. 3352), as amended in 1887, page 92, gives the right of appeal from a final judgmens in an action or special proceeding within one year.

The intent of the legislature must be deduced from the language used, and the courts have no right to look beyond the language. (*State* v. *Washoe Co.*, 6 Nev. 104; *Thorpe* v. *Schooling*, 7 Nev. 15; *State* v. *Ross*, 20 Nev. 61; *Maynard* v. *Newman*, 1 Nev. 271.) If section 1569, Gen. Stats., is ambiguous, the whole act should be examined to explain or remove that ambiguity. (2 Nev. 25, 234; 11 Nev. 109; 7 Nev. 191; 6˙Nev. 283.)

Failure to appeal in thirty days would not rob the person declared ineligible of his right to appeal within the required time, nor prevent him from moving for a new trial within such time as provided by the procedure of the election laws, or, if not provided for in the election laws, then within the time provided for in the general civil practice act.

The fault of respondent's argument is that he insists on applying the civil code of California that does provide an exact code of procedure to a county court, a court of limited and inferior jurisdiction that had.no power except in term time, and no power to continue its term or make an order out of term.

If the board of election does not perform the several acts imposed upon it, and puts the ballot in the box with the strip number on it, if such ballots are not counted, it will be left in the power of every election board in the state at every precinct to defeat and defraud every elector in the state of his constitutional right to vote and have it counted and be defeated of such constitutional right without any fault of

his own. Could such an act of the legislature possibly be held constitutional? *Davies* v. *McKeeby*, 5 Nev. 369; *Clayton* v. *Harris*, 7 Nev. 64; *Stinson* v. *Sweeney*, 17 Nev. 309; *State* v. *Findley*, 20 Nev. 198, all answer emphatically "no." See, also, *State* v. *Board of Ex.*, 21 Nev. 69.

The strip, by force of the provisions of the statute, is not a part of the ballot, and the words, marks and names that under the statute prevent a ballot from being counted are such as appear on the ballot. [Here follows argument on the facts applicable to the points.]

Under the constitution the district courts have jurisdiction in all cases in equity. (Gen. Stats. 137.) They have also the same jurisdiction under the statute (Gen. Stats. 2439), and to make such other orders as may be necessary and proper in the exercise of the jurisdiction conferred upon them by law. (Id. 2448.)

When there is a constitutional right, and no machinery provided to enforce it, the constitution, by necessary implication, confers on the court of chancery jurisdiction to protect and enforce the will of the people by suitable and proper procedure. (80 Cal. 362–4.) The cases cited by contestant —24 Cal. 449; 24 Cal. 457; 34 Cal. 635— are practically overruled by 79 Cal. 483–6. This case also shows that the supreme court ordered a *new trial* (Id. 489). If the supreme court had jurisdiction to order a new trial it follows as a corollary that the superior court (which is now in California the co-equal of our district courts) had the jurisdiction and power to have granted a new trial in the first instance.

The supreme court ordered a new trial in *Russell* v. *McDowell*, 83 Cal. 82. Is it possible that an appellate court can order a new trial in the lower court, and that such lower court cannot correct its own errors on a motion and statement for new trial? In *Coffey* v. *Edmunds*, 58 Cal. 521, a motion for a new trial was made and overruled and an appeal taken from the judgment and order overruling the motion for new trial. Judging from the eminence of counsel engaged respondent would certainly have objected to any consideration of such motion for new trial had it not been a proper proceeding.

Statutes as to contesting elections are to be liberally construed that the will of the people be not defeated.

(McCreary on Elections, sec. 396.)　The case must be heard on the merits and show the incumbent was not elected in fact.　(Id., sec. 397.)　The weight of authority in this country is that the courts have general and original jurisdiction to inquire into the regularity and validity of elections. (Id., 345–7.)　The court has the power to declare the election and order void and order a new election.　(Id., sec. 461.)

[Here follows a long argument on the right of appeal.]

. By the Court, Belknap, J.:

Opinion on motion to dismiss appeal and strike out statement:

This is an election contest.

. The parties were candidates for the office of district attorney for Humboldt county at the general election of November, 1894.　According to the official returns, Gen. Buckner received the highest number of votes, and a certificate of his election was issued.　Thereafter a contest was inaugurated by respondent, Lynip, and such proceedings had as resulted in a judgment of the district court in his favor, and against Buckner.　A motion for a new trial was made in the district court by appellant, and denied by that court; and from the judgment, and the order denying the motion for new trial, this appeal is taken.

Respondent moves in this court to dismiss the appeal upon the ground that it was not taken within the time required by the statutes of the state for an appeal to be taken in election contests.　The motion is made upon the provisions of section 46 of the act relating to elections (Gen. Stats., sec. 1569), which reads as follows: "1569.　Sec. 46. Whenever an election shall be annulled and set aside by the judgment of the district court, and no appeal has been taken therefrom within thirty days, such certificate, if any has been issued, shall thereby be rendered void, and the office become vacant."

The judgment was rendered February 20, 1895.　The motion for new trial was denied upon the 11th day of May —more than thirty days thereafter.　The judgment was to the effect that Lynip was the duly elected district attorney of the county, and, upon his doing the acts required by the statutes to be done in such cases, was entitled to the office,

etc.   This judgment is not one in which an election has been annulled and set aside.   The result of the election has been reversed in this: that Lynip, who was shown by the returns to the board of county commissioners to have been defeated, was declared elected by the judgment of the district court. But the election itself has neither been annulled nor set aside, but, on the contrary, it has been upheld.   If it had been annulled, the statute declares, the office becomes vacant, and, if there is a vacancy, it must be filled as required by law.   We do not understand counsel to admit that a vacancy does exist, but if the provisions above quoted are applicable to this case, and the election had been annulled, a vacancy in the office must be the result.

Our attention has been called to the meaning of the words "annulled and set aside," as employed in section 1561, Gen. Stats.   The section is as follows: "1561.   Sec. 38.   When any election held for an office exercised in and for a county, is contested on account of any malconduct on the part of the board of inspectors of any precinct, or any member thereof, the election shall not be annulled and set aside upon any proof thereof, unless the rejection of the vote of such precinct shall change the result as to such office in the remaining vote of the county."   This provision is unimportant to the matter in hand.   It states a principle applicable to all election contests; that is to say, that the person officially declared elected shall not be disturbed by vain and fruitless contests, and, unless a different result of the election can be reached, his election shall not be contested.

Respondent also moves the court to strike out all of the record in the case, except the judgment roll, upon the ground that the district court had no jurisdiction of the case after the entry of the judgment.   The statute relating to elections (sec. 1524, *et seq.*, Gen. Stats.) confers original jurisdiction upon district courts in this class of cases (sec. 1563), and provides that a certified copy of the judgment of the supreme court may be used as proof in certain cases; but, with these exceptions, it is silent upon the subject.   Nothing is said, in direct terms, upon the subject of new trials or appeals; and, under these circumstances, we must look elsewhere for the mode of procedure.   The civil practice act was adopted long before the passage of the act relating to elections.   It pro-

vides a mode for review upon motion for new trial or appeal in all cases tried by district courts, and in enacting the election law, it was unnecessary to provide for any further mode of procedure than the practice act furnished.

The decisions from California to which we have been referred are inapplicable to our statute concerning contested elections.

The motions are denied.

By the Court, BIGELOW, C. J.:

Opinion on the merits:

The contestant and contestee, who, for convenience, we shall call plaintiff and defendant, were rival candidates for the office of district attorney of Humboldt county at the election of 1894. Upon the returns, as canvassed by the board of county commissioners, the defendant had a majority of five votes; but, upon the trial of this contest in the district court, it was found that the plaintiff had received three more votes than his opponent, and he was accordingly declared elected. From this judgment, and an order refusing a new trial, defendant appeals.

In Rebel Creek precinct, in that county, it appears that defendant received 15 votes; the plaintiff 1; and another candidate (H. Warren), 12. The court rejected all the votes of that precinct, cast under the following circumstances: The ballots were printed, as required by law, with a strip on the left side, intended for a stub, separated from the ballot proper by a perforated line, and with a like strip on the right side, also separated by a perforated line. Upon each of these strips the number of the ticket was printed. By some accident, the binding of the stubs into book form had become broken, permitting the ballots to separate into loose sheets. When a voter applied for a blank ballot, the entire sheet was given him by the inspector, including the stub, which should have been separated from the ballot, and retained by the inspectors. When the ballot was returned to them for deposit in the ballot box, the inspectors removed the strip intended for a stub, but failed to remove the other strip. It is not charged that this was done by the inspectors fraudulently or intentionally, and the evidence is clear and uncontradicted that it was the result of a mistake upon their

part; they, and apparently every one connected with the election, supposing that they had removed everything from the ballot that the law required to be removed. It does not appear when the mistake was discovered, but certainly not until after the polls had closed.

Our statute, adopting what is popularly known as the "Australian ballot law" (Stats. 1891, p. 40, sec. 11), provides that the secretary of state shall furnish to the county clerks the paper on which the ballots are to be printed, which is to be water-marked with a design to be chosen by the secretary. The ballots are to be printed under the direction of the county clerks. They are to contain the names of all candidates whose nomination has been certified and filed according to the provisions of the act, and no other name. The names are to be arranged under the designation of the office, and the political designation of each candidate is to be printed opposite his name. When a ballot is handed to a voter, the number of the ballot is to be written on the registry list, opposite his name. He must prepare his ballot by marking with a black lead pencil a cross or X after the name of the person for whom he intends to vote. Upon handing the ballot to the inspector, that officer "shall separate the strip bearing the number from the ballot, and shall deposit the ballot in the ballot box." Sections 24 and 26 of the act, read as follows:

"Sec. 24. No ballot shall be deposited in the ballot box unless the water mark, as hereinbefore provided, appears thereon, and unless the slip containing the number of the ballot has been removed therefrom by the inspector."

"Sec. 26. In counting the votes any ballot not bearing the water mark as provided in this act shall not be counted, but such ballots must be preserved and returned with the other ballots. When a voter marks more names than there are persons to be elected to an office, or if for any reason it is impossible to determine the voter's choice for any office, his vote for such office shall not be counted. Any ballot upon which appears names, words or marks written or printed, except as in this act provided, shall not be counted."

Any officer willfully neglecting or refusing to perform any duty devolved upon him by the act is, upon conviction, to be imprisoned in the state's prison for from one to five years.

It will be noticed that the statute does not expressly direct that a ballot upon which this strip has been left shall not be counted, but these ballots were rejected upon the ground that they came within the latter part of section 26, which inhibits the counting of ballots "upon which appears names, words, or marks written or printed, except as in this act provided;" and this is the point to be determined upon the appeal, so far as they are concerned. It is, perhaps, a close question, and one upon which courts and judges may easily disagree. It is to be observed that the voters of this precinct were themselves in no wise in fault. They possessed every qualification for voting, and had complied with every requirement of the law as to registration, marking their ballots, etc.; and it is earnestly pressed upon us by defendant's counsel that if this law is to be construed as preventing the counting of their votes, either for the willful fraud or innocent mistake of the inspectors, in not removing the slip, it is unconstitutional, within the principles of *Stinson* v. *Sweeney,* 17 Nev. 309; *Davies* v. *McKeeby,* 5 Nev. 369; *Clayton* v. *Harris,* 7 Nev. 64; and similar cases. See, also, *Moyer* v. *Van De Vanter* (Wash.) 41 Pac. 60 (recently decided). As we are, however, of the opinion that that is not the correct interpretation of the act, it is unnecessary to consider this argument any further than as it throws light on the proper construction of the statute. It seems to us that ballots cast under the circumstances existing here should not be rejected, and we will now state, as briefly as possible, the reasons upon which our conclusion is based:

The right of voting, and, of course, of having the vote counted, is one of most transcendent importance, the highest under our form of government. "That one entitled to vote shall not be deprived of his privilege by action of the authorities is a fundamental principle." (Cooley, Const. Lim., 6th ed., 775.) We need not go outside the decisions just cited from our own court, to show how jealously this right is guarded. But while the legislature cannot directly deprive the elector of this privilege, section 6, art. II. of the constitution specially authorizes it to enact laws for the registration of electors, to preserve the purity of elections, and to regulate the manner of holding and making returns of the same. Such laws will necessarily sometimes have the effect

of preventing the elector from voting.    For instance, a law for the registration of voters, to be effectual, must provide that one not registered shall not vote; and, to guard the purity of the election, it may require him to mark his ballot in a certain way, and to comply with many other conditions. But in all these matters the voter had the privilege of voting, by a compliance with the law, and his failure to do so is somewhat owing to his own negligence or misfortune. Whether he can also be deprived of .it through the fraud, negligence, or mistake of others would involve the constitutional question suggested, and upon which we find it unnecessary to pass in this case.

At least, this great constitutional right is not to be taken from him upon any doubtful construction of a statute. Assuming the constitutionality of the law, before it should be construed to work his disfranchisement it must be clear that, under the circumstances then existing, the legislature intended such to be the case. The spirit in which such laws are to be construed is well stated by Andrews, J., in *Talcott* v. *Philbrick*, 59 Conn. 485, as follows:    "All statutes tending to limit the exercise of the elective franchise by the citizen should be liberally construed in his favor, and, unless the ballot comes within the letter of the prohibition against a particular kind of ballot, it should be counted. A great constitutional privilege—the highest under the government—is not to be taken away on a mere technicality, but the most liberal intendment should be made in support of the elector's action, whenever the application of the common-sense rules which are applied in other cases will enable the courts to understand and render it effectual."    "All statutes tending to limit the citizen in his exercise of this right should be liberally construed in his favor.    Unless the ticket comes within the letter of the prohibition it should be counted."    (*Owens* v. *State*, 64 Tex. 500, 509.)    To the same effect are *State* v. *Saxon*, 30 Fla. 668; *State* v. *Phillips*, 63 Tex. 390; *Boyd* v. *Mills*, 53 Kan. 594; *Kellogg* v. *Hickman*, 12 Colo. 256; *Bowers* v. *Smith*, 111 Mo. 61; *Parvin* v. *Wimberg*, 130 Ind. 561; *State* v. *Russell*, 34 Neb. 116; *Stackpole* v. *Hallahan*, 40 Pac. 80.

Laws are also to be construed according to their spirit and meaning, and not merely according to their letter.    "It is a

familiar canon of construction that a thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter, and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." (*Riggs* v. *Palmer*, 115 N. Y. 506.) "It is one of the great maxims of interpretation to keep always in view the general scope, object, and purpose of the law, rather than its mere letter." (*Rutledge* v. *Crawford*, 91 Cal. 533.) "A rigid and literal reading would, in many cases, defeat the very object of the statute, and would exemplify the maxim that 'the letter killeth, while the spirit keepeth alive.' Every statute ought to be expounded, not according to the letter, but according to the meaning. * * * And the intention is to govern, although such construction may not, in all respects, agree with the letter of the statute." The reason and object of a statute are a clue to its meaning, and the spirit of the law and the intention of its makers are diligently to be sought after, and the letter must bend to these. (*Tracy* v. *Railroad Co.*, 38 N. Y. 433, 437.) This meaning is undoubtedly to be ascertained from the language of the act, viewed in the light of the circumstances under which it is used. If plain and unambiguous, it must be construed as it reads, no matter how unreasonable its operation may be. But as it is not to be presumed that the legislature intended to enact an unreasonable or unjust law, where such would be the result of its operation, if construed in a certain way, and the language is not positive and direct to that effect, it is the duty of the courts to cast about to see if it is not susceptible of some other construction, and in doing this they should consider, not only the language used in some particular section, but the whole scope and purpose of the act, and adopt, if possible, such a construction as will harmonize the various sections with this purpose, and with the demands of justice.

What was the object and purpose of the enactment of the Australian ballot law, the essential features of which have now been adopted by nearly every state in the Union? This question has often been answered by the courts, and sometimes in language that we shall not attempt to improve upon. In one case the supreme court of Connecticut said: "The object of the statute of 1889 is obvious. It is to secure

an honest vote, correctly expressing public sentiment, by pre-
venting fraud, corruption, and intimidation." After speak-
ing of certain provisions of the Connecticut law, the court
resumed: "This would seem to effectually preclude any
opportunity for fraud or imposition. Corruption, by making
it impossible for any one who would bribe or otherwise cor-
rupt a voter to know that the required vote was actually
deposited. Intimidation, by giving to each voter an oppor-
tunity to select and prepare his ballot, and to deposit it, free
from observation, and in such manner that no one but him-
self can possibly know how he votes, unless he chooses to
disclose it." (*Talcott* v. *Philbrick*, 59 Conn. 472, 478.) In
another case it was said: "A study of the statute upon the
subject of elections leaves no doubt that the purpose is to
secure a fair expression of the will of the electors of the
state, by secret ballot, uninfluenced by bribery, corruption,
or fraud. The disfranchisement of whole precincts by reason
of an honest mistake on the part of the election officers is
inconsistent with that purpose." (*Parvin* v. *Wimberg*, 130
Ind. 561.) And again: "The evident intent of this provi-
sion was to provide against voters marking the individual
ballot which they cast in such manner as to distinguish it."
(*Lindstrom* v. *Board*, 94 Mich. 467.)

This being the object of the law, it should be so construed
as to remedy the evil against which its provisions are
directed, and, at the same time, not to disfranchise voters
further than is necessary to attain that object. It would be
almost the work of omniscience to enact a law in such lan-
guage that it would not, under any circumstances, do more
nor less than was intended by the lawmaker. Even words
most carefully chosen will, in some unanticipated situation,
overrun that intention, and in others fall short of it. It is
the duty of the courts to keep that intention, once it is
ascertained, steadily in view, and to endeavor to apply the
law where it was intended to apply, and to except those
cases where it was not.

It being, then, the purpose of the law to effectually pro-
hibit and prevent intimidation and vote buying, all its
provisions were enacted with that end in view. Where it is
forbidden to count ballots containing names, words, or
marks other than those provided for in the act, notwithstand-

ing the generality of the language, only such as tend to distinguish the ballots were intended, and such as were, or may have been, placed upon the ticket for that purpose. For instance, all nominations for state officers are to be filed in the office of the secretary of state, and he is to certify them to the various county clerks. It certainly never was intended that if he should, either by inadvertence or design, certify the name of a person who had not been nominated, and which was therefore wrongfully printed upon the ballots, this should invalidate, and require the rejection of, every vote cast in the state; and yet this would be the result of a strict adherence to the letter of the law, for it would be a name on the ballot not provided for by the act. The same may be said of the wrongful printing of a name on the ballots by order of the county clerk, or the insertion by the printer of a word or mark not provided for by the law, and which would be on all tickets alike. This would in no manner tend to distinguish one ballot from another, and could not be used for a fraudulent purpose. Such a word or mark would not be within the spirit of the law, although within its letter; and in such case the law should be liberally construed in favor of the voter, and not so as to disfranchise a whole county. This simply illustrates the proposition that there are situations in which the legislature could not have intended that ballots with forbidden words or marks upon them should not be counted. They are instances of where the language has overrun the intention.

But in the case we have to deal with here the marks upon the ballots (admitting that marks upon the strip attached to the ballot are marks upon the ballot itself, as is doubtless within the intention, if not the letter, of the law), although not placed thereon intentionally, nor with the voter's knowledge or consent, are such as to identify the ballots. Does this alter the case? Under the circumstances existing here, could this fact have been used for the purposes of intimidation or bribery? It is not possible to intimidate a man into voting for men or measures against his will, unless he has reason to believe that if he does not so vote it will become known to the intimidator. Here the voter knew that if the law was complied with no one could ever ascertain how he had voted. It is not shown that any knew that it was not

being complied with, and in fact the fair inference from the testimony is that it was not known to any one until after the polls had closed. All supposed that the slips were being removed, and it follows that none could have been intimidated by the fact that they were left on the ballots.

But the principal reason for forbidding these distinguishing marks was undoubtedly to defeat bribery. It was believed that the vote buyer would not invest money in the purchase of votes if there was no way by which he could ascertain whether the voter had voted as agreed. The only way in which this could be done by means of marks would be by some mark being placed upon the ballot which had been agreed upon between them; and it must be done either by the voter himself, or by some one else with his knowledge and consent. It is clear that this slip was left on the ballots accidentally, and not for any such purpose as that; and therefore it is not within the spirit or meaning of the law, so far as corruption is concerned. By the blunder of the inspectors, the strips and numbers were left upon the ballots, whereby it was possible to ascertain just how each one had voted. This was done unintentionally, and without the voters' knowledge. Consequently, as we have tried to show, it could not have been made the means of intimidation, nor the agent of corruption. But by reason of it, without being at all in fault themselves, the voters have incurred all the odium and disadvantage of having the knowledge of how they voted made public. What reason can there be for adding to their punishment that of disfranchisement? To so hold would be like piling Ossa upon Pelion, and, it would seem, was clearly not intended by the law. To hold that it was, would be not to liberally construe the act in favor of the voter, but strictly against him.

In addition to what we have said of the scope and spirit of the ballot law, we think there is that in the letter of the act which strengthens our conclusion very much. By section 24, already quoted, it is provided that no ballot shall be placed in the ballot box upon which the water mark does not appear, nor from which the slip has not been removed. But, while section 26 provides that ballots found in the box not bearing this water mark shall not be counted, it says nothing about the slip being left on. Considering the juxtaposition

of these terms in section 24, it is hardly probable that the omission to mention the slip in section 26 was accidental. If not, it clearly indicates an intention that leaving the slip on should not cause the rejection of the ballot. There is reason, too, why such a distinction should be made. If a citizen votes a ballot not bearing the water mark, he is somewhat in fault himself; and, besides, there could be but one purpose for substituting such a ballot for the one that was genuine, and that would be fraud. On the other hand, the slip is to be removed by the inspector after the ticket is surrendered to him, and with this the voter has nothing to do; and very often, as in this case, it might be left on the ballot by oversight or accident.

In this connection we quote from the recent decision by the supreme court of Washington, already mentioned. Speaking of the decisions that have been rendered under the ballot laws of the different states, the court said: "These cases cannot all be harmonized, but the general trend thereof has been to recognize a clear distinction between those things required of the individual voter and those imposed upon election officers. There is a disposition to hold the former valid and mandatory; but where there has been a substantial compliance with the law on the part of the individual voter, and it is made to appear that there has been in fact an honest expression of the popular will, there is a well-defined tendency to sustain the same, although there may have been a failure to comply with some of the specific provisions of the law upon the part of the election officers, or some of them." (*Moyer* v. *Van De Vanter*, 41 Pac. 60.) In that case the law required the inspector, or one of the judges, to write his initials on the ballot before it was delivered to the voter, and directed that any ballot not bearing those initials should be void, and not be counted. But it was held that the law was unconstitutional, and, where the officials had failed to so mark any of the ballots of a precinct, that they should still be counted.

There are decisions conflicting with the views we have expressed, but we believe the greater in number, and the better-considered cases, support our conclusions. We have examined them all, but it would be an endless and unprofitable task to review them, and we shall not attempt it. Our

conclusion concerning these ballots renders it unnecessary to pass upon the other ballots objected to by appellant.

Judgment and order refusing a new trial reversed, and cause remanded.

BONNIFIELD, J.:   I concur.

BELKNAP. J., dissenting:

The law of 1891 directs that the number of each ballot shall be the same as that of the corresponding stub (sec. 12), and that the number of the ballot shall be written upon the registry list, opposite the name of the voter receiving it (sec. 19).   After preparing the ballot, it must be delivered to the inspector, who shall separate the strip bearing the number from the ballot, and deposit the ballot in the ballot box (sec. 20).

At Rebel Creek precinct, the inspector, through ignorance of the law, and not willfully, neglected to separate the strip bearing the number from the ballot.   The entire vote of the precinct was cast in this way.   The act of the inspector was in direct disobedience to the requirements of the law, which, in section 20, declares that the strip and number shall be destroyed before the ballot is cast; and by section 24, that no ballot shall be deposited in the ballot box unless the slip containing the number of the ballot has been removed by the inspector.

I refer to these provisions, not as authorizing the canvassers to throw out the ballots, but as illustrating the intention of the legislature in passing the statute providing for a secret ballot.   The prohibition against counting ballots is contained in the twenty-sixth section of the act, as follows: "Sec. 26. In counting the votes any ballot not bearing the water mark as provided in this act, shall not be counted, but such ballot must be preserved and returned with the other ballots.   When a voter marks more names than there are persons to be elected to any office, or if for any reason it is impossible to determine the voter's choice for any office, his vote for such office shall not be counted.   Any ballot upon which appears names, words or marks, written or printed, except as in this act provided, shall not be counted."   Under the last sentence of this section, these ballots should not be counted.   The purpose of the act, as expressed in its title, is

"An act relating to elections and to more fully secure the secrecy of the ballot." No act of the inspectors was so well calculated to expose the vote, and defeat the intention of the legislature, as their neglect to destroy the number on the slip. Any person, upon inspection of the registry list, could have ascertained the vote of each elector.

I admit that if my views are to be adopted the voters of the precinct at that election will be disfranchised, but I am confronted with what I think are clear and imperative provisions of law, incapable of judicial construction. Under the English law of 1872, the presiding officer at the polling station marked upon the face of the ballot given to each the number of the voter appearing on the burgess roll, which would enable any one, upon inspection, to identify the way in which the party had voted. It was held that these ballots were void, and should not have been counted; but the error did not affect the result of the election; the prevailing candidate having been elected, irrespective of the contested ballots. (*Woodward* v. *Sarsons*, L. R. 10 C. P. 733.)

In *West* v. *Ross*, 53 Mo. 350, the law of Missouri required the ballots to be numbered, and provided that any ballot not numbered should not be counted. The judges of election, through inadvertence, neglected to number any of the ballots; but the court held that the statute was mandatory, and all of the ballots were rejected. The court said: "This case may be a hard case, and doubtless is; but the legislative enactment is clear, and although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land in order to provide for hard cases. In the present case the legislature has provided and required that the ballots should be numbered, and then provides, in express terms, that no ballot not numbered shall be counted. Can we say that such ballots shall be counted, without an attempt at judicial legislation? I think not, and it would be a misapplication of terms to say that such a statute is only directory."

For these reasons I dissent from the judgment.