TOWN OF EUFAULA v. GIBSON *et al.*

No. 226.   Opinion Filed November 13, 1908.

(98 Pac. 565.)

1. COUNTIES—County Seat—Election— Majority — What Consti - tutes. For the purpose of determining the majority of the votes cast at a special election called to vote upon the location or relocation of a county seat in accordance with the provisions of section 6 of article 17 of the Constitution (sections 328 to 334, inclusive, Bunn's Edition), all of the valid legal ballots cast on the question intelligible as well as unintelligible should be considered, and to effect a removal it must be made to affirmatively appear that a majority of this number were cast in favor thereof.

2. SAME—Evidence—Re-Examination and Recount of Ballots. Where, in such a case. there is an allegation showing that the city, town, or place mentioned in the certificates as having received a majority of the votes cast did not in fact receive such majority, but that there were other ballots not counted in said certificates proper to be considered in estimating the number on which such majority should be computed, then the ballots became the best evidence of the facts and should be counted.

3. SAME—Ballots Excluded. Distinguished ballots, illegal ballots. such as those cast by persons other than qualified electors, and blank ballots should be excluded from estimation in making up the aggregate number on which such majority is to be computed.

4. ELECTIONS—"Distinguished Ballots"—What Are. A "distinguished ballot" which cannot be counted, is one which bears an identification mark, made by the voter or made with his connivance, consent, or knowledge, and made for the purpose of distinguishing that ballot from the others cast.

5.     COUNTIES—County Seat—Elections—Majority—Ballots Count-
ed.  Ballots on which the election officials have placed numbers.
if otherwise valid, should be counted as cast, where it is not
shown that such numbering was done prior to the time of the
canvass and with the connivance, consent, or knowledge of the
electors, for the purpose of fraudulently distinguishing them.
Kane, J., dissenting.

(Syllabus by the Court.)

Original proceedings in a county seat controversy by the Town
of Eufaula against Charles Gibson and others, constituting the
Board of Commisioners of McIntosh County, and others, to re-
strain the carrying into effect of a proclamation by the Governor,
declaring the Town of Checotah to have received a majority of
all the votes cast for county seat of McIntosh County. Petition
sustained.

*Tully & Collier,* for plaintiff.
*Dale, Bierer & Hegler, Horace B. Reubelt, Charles R. Free-
man,* and *Chessie McIntosh,* for defendants.

DUNN, J.  This controversy grows out of a special election
called by the Governor of the state of Oklahoma pursuant to a pe-
tition filed in his office by the electors of McIntosh county.  The
returns of the same were, in accordance with law, forwarded to his
office, and he canvassed the same, and on the 6th day of June,
1908, issued his  proclamation, in which he declared that the
"total vote cast at said election for  county  seat  of  McIntosh
county, Oklahoma, was 3,231; and that of said votes the city, town,
or place of Checotah, which was duly and legally selected as can-
didate for county seat at said election, received 1,647 votes, which
is a majority of all the votes cast" at said election, and, in accord-
ance therewith, proclaimed Checotah as the legally elected county
seat of McIntosh county.  Eufaula and Stidham were each com-
petitors in the contest.  The former, being the town nominated as
the county seat by the constitutional convention, received 1,200
votes; the latter, 384.  This action is brought in this court by Eu-
faula for the purpose of restraining the carrying into effect of the

said proclamation under the authority of sections 16 and 17 of article 4, of chapter 31, p. 385, of the Session Laws of Oklahoma of 1907-08, being one of the enactments of the first state Legislature. On the making up of the issues, the cause was referred to John A. Remy, Esq., as a special referee, to take the evidence and report the same with his findings of fact and conclusions of law.

It will be observed that the Governor based his finding and proclamation upon the number of votes cast which were actually counted for the different candidates. Counsel for plaintiff in the petition filed takes exception to this manner of arriving at the actual number of votes cast, and in paragraph 3 thereof averred that the proper rule to be observed in the ascertainment of the actual number of votes cast should be by taking into consideration not only the votes which were actually cast and counted for the different candidates, but all the ballots which were cast, including those which were mutilated and uncounted, as well as those which were intelligible and counted. This paragraph is as follows:

"That at the said election held on the said 23rd day of May, 1908, there were in fact cast thirty-three hundred and fifty-two (3,352) votes, and that of said votes so cast, the town of Checotah received sixteen hundred and forty-seven (1,647) votes, the town of Eufaula received twelve hundred (1,200) votes, the town of Stidham received three hundred and eighty-four (384) votes, three votes were marked on the pollbooks 'Challenged,' fifty-three (53) ballots returned marked 'Mutilated,' two (2) votes marked on the poll list 'Exposed,' and sixty-five (65) votes not accounted for at all, and that a majority of said votes cast is sixteen hundred and seventy-seven (1,677), and that, notwithstanding, the said town of Checotah received thirty (30) votes less than a majority of all the votes actually cast at said election, his excellency, Charles N. Haskell, Governor of the state of Oklahoma, acting as a board of canvassers, wrongfully rejected all of the votes shown, by said pollbooks as cast, except the votes that were cast for the respective towns that were candidates at said election, and the votes returned as mutilated, and as shown by a copy of his proclamation which is hereto attached, marked 'Exhibit A,' and made a part hereof, unlawfully declared that Checotah had received a majority of all the votes cast at said election, and was named as the

location of the permanent county seat of said county of McIntosh, state of Oklahoma."

The referee after qualifying under his appointment with the parties before him, opened the ballot boxes containing the ballots polled at the election and received all of the evidence offered. It may well be stated here that there is no allegation of fraud of any kind, and it is agreed that the ballots before the court are the same ones cast by the electors of the county. The referee found and concluded as a result of his investigation as follows:

"I therefore find from the evidence and a computation of all ballots cast in said election in said county: That the total number of votes and ballots, including the mutilated ballots, were three thousand, three hundred and fifty-five (3,355). That the total number of ballots cast, exclusive of mutilated ballots were three thousand, two hundred sixty-eight (3,268). Of the total number of votes cast, exclusive of mutilated ballots, Checotah received one thousand, six hundred and sixty-four (1,664); Eufaula, one thousand two hundred and fifteen (1,215); and Stidham, three hundred eighty-nine (389).

| | |
|---|---:|
| Checotah | 1,664 |
| Eufaula | 1,215 |
| Stidham | 389 |
| | 3,268 |

"That the total number of mutilated ballots were eighty-seven (87). That neither of said towns, candidates in said election for the location of said county seat, received a majority of the votes cast."

Counsel for both parties have filed exceptions to this report; counsel for Eufaula taking the position that many of the ballots which were counted for Checotah by the referee were mutilated, and should not have been so counted, while counsel for Checotah urge with equal insistence that many of the votes which were declared by the referee as mutilated, and not to be counted, were in fact cast for Checotah. No claim is made on the part of Eufaula that it received a majority of the votes cast in the election. The whole effort of its counsel being devoted in reducing the number of

votes counted for Checotah to a point below a majority of those cast, while the effort of counsel for Checotah has been to secure the counting of a sufficient number to raise its number above the majority of votes considered in making up the total number of votes cast, or to reduce the total considered to a point where those counted would constitute the number required.

We are fully impressed with the importance of this controversy, not only to the litigants immediately involved, but to the citizens of the county of McIntosh and the state generally, and particularly to those counties where controversies of like character are pending, and we have given the question involved herein our most anxious and considerate attention. The ballots brought into question by the parties have all been scrutinized by the entire court, and on the facts found there is entire accord among its members.

Counsel for Checotah objected to the opening of the ballot boxes and recounting the ballots in the absence of a charge of fraud, basing this objection upon that portion of section 7, art. 1, c. 17, p. 238, Sess. Laws 1905, providing for a certificate showing the number of votes received by each candidate, and which provides that:

"Such certificates when properly executed and returned shall be *prima facie* evidence of the number of votes received by each candidate as shown therein and in case of variance between the totals as shown by said certificates and the tally sheets, in the absence of fraud, the certificate shall control."

The objection was overruled, owing to the language of our Constitution, which provides that in county seat elections there is to be considered not only the vote counted for the different candidates, but this vote, to be effective, must be a majority of the votes cast, and, where there are allegations showing that the votes received as shown by such certificate do not constitute a majority of the votes cast, then, under such constitutional provision, it becomes necessary to open the ballot boxes to ascertain the aggregate number on which to estimate such majority. The law relat-

ing to candidates for public office requires the successful party to receive but a plurality or majority of the valid, legal, intelligible ballots, but not a majority of the votes cast as in county seat election. Hence in our judgment it was proper and necessary to open the ballot boxes, as the ballots themselves are the best evidence of the ultimate fact to be established.

The report made by the referee shows that the most careful attention was given to the questions before him and evinces a comprehensive grasp of the propositions involved. Our Statute (section 282, art. 15, c. 66, par. 4480, Wilson's Rev. & Ann. St. Okla. 1903), provides that, "when the referee is to report the facts, the report has the effect of a special verdict," and the general rule, under this statute, is that, where a cause is referred to a referee, with the power to hear and determine the same and to report his findings of fact and conclusions of law thereon, the same will not be set aside as against the evidence, although the testimony is conflicting, if there is legal evidence reasonably tending to sustain the findings upon which his conclusions are based. *Shannon v. Petherbridge*, 17 Okla. 507, 87 Pac. 668; *Erisman v. Kerwin*, 8 Okla. 92, 56 Pac. 858; *Harper v. Hendricks*, 49 Kan. 718, 31 Pac. 734.

The foregoing states the rule generally applicable where the evidence is oral, and not, as in the case at bar, made up entirely of ballots which are construed by the court under the limitations made in the election law, as any other written instrument. *State ex rel. Blodgett v. Eagan*, 115 Wis. 417, 91 N. W. 984; *People v. Saxton*, 22 N. Y. 309, 78 Am. Dec. 191; *Rutledge v. Crawford*, 91 Cal. 526, 27 Pac. 779, 13 L. R. A. 761, 25 Am. St. Rep. 212; *Parvin v. Wimberg et al.*, 130 Ind. 561, 30 N. E. 790, 15 L. R. A. 775, 30 Am. St. Rep. 254; *Winn v. Blackman*, 229 Ill. 198, 82 N. E. 215, 120 Am. St. Rep. 237. But the rule has no application in an election contest where the ballots in controversy have been returned to the court by the referee, and under which by agreement of counsel, or by his findings, their identify as being the ones cast is established. Their legal effect is a question of law

which presents itself to the court clear and free from any presumption arising out of the holding of the referee. Moore on Facts, § 1278; *Faulkner v. Simms,* 68 Neb. 299, 89 N. W. 171, 94 N. W. 113.

Entertaining this view of the law, we have carefully gone over and examined the challenged ballots, and, while we find several blank ballots and two were held to be distinguished, there were not a sufficient number of either to reduce the whole number of votes counted as cast in the aggregate to a point where the vote counted for Checotah would give it a majority; nor did the consideration of the ballots counted for Checotah nor those not so counted and to which counsel excepted make a sufficient change in the result to cause a reversal of the conclusion reached by the referee.

In addition to the questions which arose in considering the separate ballots cast, there is presented another, involving 167 ballots on the back of each of which appeared a number. These were cast in three different precincts, and of them Checotah received 55; Eufaula, 97; and Stidham, 15. The referee found that these numbers, which were consecutive, were made by the election officials, and there is no evidence before us to show that any of the voters either connived at, consented to, or had any knowledge that this was being done. Neither is there any evidence to sustain a finding that any voter intended or consented to having his ballot so marked for the purpose of distinguishing it. An inspection of the ballots convinces us that the election officials, and not the voters, made the numbers. The materiality of the issue raised is apparent when we consider that, should these be held to be distinguished ballots—that is, ballots fraudulently marked for the purpose of distinguishing them—and should we further hold that they cannot be counted or considered for any purpose, either for the town for which cast or in making up the sum total, to be considered, then the vote received by Checotah would be a majority of the votes cast; but, should they be allowed to stand and be counted as lawfully expressing the elector's wish, the vote counted

for Checotah would be less than the requisite number. Let us see, then, what is required to constitute a distinguished ballot.

The general rule seems to be as stated by Judge Irwin in the case of *McClelland v. Erwin*, 16 Okla. 622, 86 Pac. 287, wherein he said:

"We think that, to constitute a distinguishing mark, the mark, whether made by the use of a letter, figure, or character, should be such a mark as shows an intention on the part of the voter to identify or distinguish his particular ballot from others of this class, and any marks inadvertently made on a ballot, or made through carelessness or ignorance, which does not show upon the face of the ballot that such mark was made with the intention of distinguishing that ballot from others of the same class, or that that result would be accomplished by the mark, should not be treated as a distinguishing mark. Human experience teaches us that it is often very difficult to preserve absolute cleanness and neatness of the ballot; that in marking the various names on the ballot with the device provided by the election officers, a man will through inadvertence or carelessness place a stamp where it is not intended to be, and on discovering the error will immediately correct it, and at the same time this inadvertent or careless marking will not be done with the intention of identifying this particular ballot, nor will such be the result, nor do we think that the law should be so strictly construed as to render, in the absence of fraud, such a ballot illegal."

In support of the rule thus laid down, the following extract, taken from the case of *Parker v. Hughes*, found in 64 Kan. 216, 67 Pac. 637, 56 L. R. A. 275, 91 Am. St. Rep. 216, wherein the Supreme Court of that state was passing on the same question, was quoted:

"A ballot bearing a distinguishing mark purposely made should be rejected if the mark is of such nature, or is so placed on the ballot, that the judges or courts might find, in the absence of testimony, or upon testimony if offered, that there were reasonable grounds for believing that such mark was made by the voter with the intent that his ballot should be distinguished from others in the box; that, in determining what ballots should be counted, the court should look at the questioned one, and from such inspection, aided by the notorious facts and circumstances of the

election at which it was cast, determine whether the questioned mark was intended by the voter as a distinguishing mark or not, and if, upon such inspection and consideration, aided by evidence *aliunde* if offered, the court should conclude that the mark was made for the purpose of distinguishing the ballot, or might be reasonably thought to be so intended, the ballot should not be counted."

We are not referred to, nor have we been able to find, any case wherein this identical question has been decided. The nearest approach to it is a case decided by the Supreme Court of Nevada. *Lynip v. Buckner,* 22 Nev. 426, 30 L. R. A. 354. The statute of Nevada provides that any ballot on which appears "names, words, or marks, written or printed, except as provided in this act, shall not be counted." The statute of Oklahoma on the same propositon (section 8, c. 17, art. 1, p. 238, Sess. Laws 1905) provides that "any ballot which bears any distinguishing mark, or on which any writing appears with pen or pencil, and any ballot upon which the judges are unable to agree as to how it shall be counted, the same shall not be counted but shall be designated as mutilated ballots, and shall be preserved and kept separate from the ballots counted." The scope and effect of these two statutes, it will be observed, are practically the same.

Under the election act of Nevada, the ballots are prepared in three parts; the stub, separated by a perforated line from the ballot proper, and a slip, also separated in the same manner; the stub and the slip each bear a corresponding number. Under the law, it was the duty of the election official to deliver to each voter one of the ballots detached from the stub and bearing the slip with the number as stated. After being stamped as provided by law by the voter and returned to the election official, it was his duty to detach from the ballot the slip bearing the number. In one precinct the officials neglected to do this, but deposited the ballots with the number still attached, and counted the ballots as cast just as the ballots in the case at bar were counted, notwithstanding the fact that they contained numbers placed thereon by

the election officials. On a contest being brought on the statute which provided as above set out, the Supreme Court of that state said, in construing the same:

"This meaning is undoubtedly to be ascertained from the language of the act viewed in the light of the circumstances under which it is used. If plain and unambiguous, it must be construed as it reads, no matter how unreasonable its operation may be. But as it is not to be presumed that the Legislature intended to enact an unreasonable or unjust law, where such would be the result of its operation if construed in a certain way, and the language is not positive and direct to that effect, it is the duty of the courts to cast about to see if it is not susceptible of some other construction, and in doing this they should consider, not only the language used in some particular section, but the whole scope and purpose of the act, and adopt, if possible, such a construction as will harmonize the various sections with this purpose and with the demands of justice. * * * Where it is forbidden to count ballots containing names, words, or marks other than those provided for in the act, notwithstanding the generality of the language, only such as to tend to distinguish the ballots were intended, and such as were, or may have been, placed upon the ticket for that purpose. * * * They are instances of where the language has overrun the intention. But in the case we have to deal with here, the marks upon the ballots (admitting that marks upon the strip attached to the ballot are marks upon the ballot itself, as is doubtless within the intention, if not the letter, of the law), although not placed thereon intentionally, nor with the voter's knowledge or consent, are such as to identify the ballots. Does this alter the case? Under the circumstances existing here, could this fact have been used for the purposes of intimidation or bribery? It is not possible to intimidate a man into voting for men or measures against his will unless he has reason to believe that if he does not so vote it will become known to the intimidator. Here the voter knew that if the law was complied with no one could ever ascertain how he had voted. It is not shown that any knew that it was not being complied with and in fact the fair inference from the testimony is that it was not known to any one until after the polls closed. All supposed that the slips were being removed. and it follows that none could have been intimidated by the fact that they were left on the ballots.

"But the principal reason for forbidding these distinguishing marks was undoubtedly to defeat bribery  It was believed that the vote buyer would not invest money in the purchase of votes if there was no way by which he could ascertain whether the voter had voted as agreed.  The only way in which this could be done by means of marks would be by some mark being placed upon the ballot which had been agreed upon between them; and it must be done either by the voter himself, or by some one else with his knowledge and consent.  It is clear that this slip was left on the ballots accidentally, and not for any such purpose as that; and therefore it is not within the spirit or meaning of the law, so far as corruption is concerned.  By the blunder of the inspectors, the strips and numbers were left upon the ballots, whereby it was possible to ascertain just how each one had voted.  This was done unintentionally, and without the voters' knowledge.  Consequently, as we have tried to show, it could not have been made the means of intimidation, nor the agent of corruption.  But by reason of it, without being at all in fault themselves, the voters have incurred all the odium and disadvantages of having the knowledge of how they voted made public.  What reason can there be for adding to their punishment that of disfranchisement?  To so hold would be like piling Ossa upon Pelion, and, it would seem, was clearly not intended by the law.  To hold that it was, would be not to liberally construe the act in favor of the voter, but strictly against him."

The reasoning of the court in this case, it seems to us, is entirely applicable to the facts in the case at bar, and to hold that these ballots were not distinguished, but should be counted as cast where otherwise valid, is in consonance with authority as well as good reason and justice.  A voter ought not to be disfranchised and his ballot rejected where, as in this case, an election official improperly marks or numbers it, when it is not shown when it was done or that it was done with the connivance, consent, or knowledge of the voter, and for the purpose of distinguishing it.

Another thought in this connection which in our judgment strengthens the view we have above expressed is this:  If three of the precincts were not to be counted by reason of the innocent and ignorant numbering of the ballots by the officials, many more,

one-half—indeed, to carry the example to the extreme, the ballots in all but one precinct—might have been so treated, and, if contention of counsel be sustained, then the majority; of the valid votes cast in one precinct would determine the location of the county seat, the vast majority of the electors of the county who attended and voted on the proposition being disfranchised by the innocent, ignorant, and mistaken acts of others over which they had no control. Can it be thought that such a construction is within the law? We are familiar with the rules and cases on statutory construction declaring the doctrine that where the statute is plain and unambiguous there is no room for construction by the courts, and that those portions of the election laws proclaimed in mandatory language are to be so construed and sustained by the courts; but the very warp of the woof of the whole law on the subject of the construction of written laws is, as is stated in the case of *People ex rel. Keeney v. City of Chicago,* 152 Ill. 546, 38 N. E. 744, as follows:

"A thing within the intention is regarded as within the statute though not within the letter, and a thing within the letter is not within the statute unless within the intention. *Perry County v. Jefferson County,* 94 Ill. 214; *People v. Hoffman,* 97 Ill. 234; *Anderson v. Chicago, Burlington & Quincy Railroad Co.,* 117 Ill. 26, 7 N. E. 129. The several provisions of the statute should be construed together in the light of the general objects and purposes of the enactment, and so as to give effect to the main intent, although particular provisions are thus construed not according to their literal reading. *Hill v. Harding,* 93 Ill. 77; *Wabash, St. Louis & Pacific Railway Co. v. Binkert,* 106 Ill. 298. The intention is to be gathered from the necessity or reason of the enactment, and the meaning of words enlarged or restricted according to the true intent. *Castner v. Walrod,* 83 Ill. 171, 25 Am. Rep. 369; *Cruse v. Aden,* 127 Ill. 231, 20 N. E. 73, 3 L. R. A. 327. That which is implied is as much a part of the statute as that which is expressed. Potter's Dwarris, 145; *United States v. Babbitt,* 1 Black, 55, 17 L. Ed. 94. When the literal enforcement of a statute would result in great inconvenience and cause great injustice, and lead to consequences which are absurd and which the Legislature could not have contemplated, the courts are bound to

presume that such consequences were not intended, and adopt a construction which will promote the ends of justice and avoid the absurdity. *Bryan v. Buckmaster,* Breese, 408; *People v. Marshall,* 1 Gilmon, 672."

Moreover, the statute provides that a ballot shall not be counted where it bears any distinguishing mark or on which any writing appears. The question may well arise, when, in order to render a ballot invalid, shall such mark or writing appear? Clearly, in our judgment, prior to the time it is taken up to be counted by the officials. If such mark or writing does not so appear, then the ballot should be counted. In the case at bar we have no light on this subject; that is, the evidence does not disclose whether those numbers were placed on the ballots prior to being deposited in the ballot boxes or after being taken therefrom and in the course of the canvass. If in the latter case, we believe there could be no doubt on the subject; if in the former, we hold, in view of the fact that the numbers made upon the 167 ballots involved herein were not made by the voter but by the election officers, and there being a total absence of evidence showing that they were made either prior to being deposited in the boxes or with the connivance, knowledge or consent of the electors, or for the purpose of distinguishing them, the same should be counted as cast.

We do not mean to pass upon in this case, for the reason that we need not, what the effect would be on the ballot had the evidence shown that the voter was aware of the fact, knew, and saw without protest, the number being placed upon his ballot prior to its being deposited in the box by the election officials. In a later case from the Supreme Court of Nevada, the case of *Sweeney v. Hjul,* 23 Nev. 409, 48 Pac. 1036, 49 Pac. 169, the case of *Buckner v. Lynip, supra,* was cited and distinguished. That case was one wherein the voters of one precinct were delivered the ballots with both the stub end and the number thereon, and in this condition cast them. The law required the ballot to be separated from the stub on being delivered to the voter, and the Supreme Court, held, in a contest that the voter knowing this, and being a

party to the identification of his own ballot, cast one which was distinguished and declined to count the same.

This conclusion on our part brings us to the most serious question in the case, and upon the solution of which we have devoted much effort, and on which will depend whether the Governor's proclamation fixing the county seat of McIntosh county at Checotah will be sustained and become final, or whether another election shall be called with Checotah and Eufaula as the candidates in accordance with the Constitution.

If the law requires the elimination, in computing the whole number on which the majority is to be computed, of the 87 ballots found by the referee to be mutilated, Checotah, having received 1,664 votes, would have a majority of the votes cast. If, however, we hold that the term "votes cast" properly includes not only the votes counted, but also the ballots cast by the electors where valid and free from fraud, and which manifest an honest effort on the part of the voter to participate in the election, but which were so mutilated that they were unintelligible and for this reason could not be counted for either place, then Checotah would not have received a majority.

The provisions for locating and relocating county seats of different counties of the state are contained in article 17 of the Constitution, section 6 whereof (section 328, Bunn's Ed.) is as follows:

"The towns herein named as county seats shall be and remain the county seats of their respective counties until changed by vote of the qualified electors of such county."

Paragraph "b" of said section, being section 333 of Bunn's Constitution, provides:

"If a majority of all the votes cast in the county at such county seat election shall be in favor of any town, such town shall thereafter be the county seat; * * * but, if more than two towns are voted for and no town receive the requisite proportion of all the votes cast, then all names of towns voted for on said ballot, except the two receiving the greatest number of votes, shall be dropped; * * * and a second election, at which only two

towns which received the greatest number of votes cast at the first election shall be voted for.   *   *   * "

· Now the question which presents itself under this is, Does the phrase "votes cast" mean votes cast and counted, or does it mean ballots cast or votes cast, both counted and not counted because of mutilation? It is the contention of counsel for defendant that the former is the construction to which this language is susceptible, and counsel for plaintiff insist that it is open to the latter construction only, and they have been diligent and vigorous in presenting their different views. The adjudications of neither the territorial Supreme Court nor of our own court afford us any light on the subject, and it has been found necessary by all parties to resort to the decisions of the other courts for assistance in determining the proper construction of this language.

There are almost a countless number of opinions of the different courts in cases where constitutional and other provisions have been submitted for the consideration of the electors of a state or a subdivision thereof, the decision of which turned on the law relating to the number of votes which the proposition must secure in order to become a law, whether by a majority of the voters voting at the election or whether by merely a majority of the voters voting upon the proposition presented. They will not, however, assist us much in this controversy for it must be decided upon the language of our Constitution; but as some of the cases relied on by defendant are of this class, we deem it proper to discuss the leading ones of those cited for the purpose of distinguishing them from the proposition here presented.

One of the best-considered of these cases is that of *In re Denny*, 156 Ind. 104, found in 59 N. E. 359, 51 L. R. A. 722, That was a case in which an amendment to the Constitution was submitted to the voters of Indiana, the Constitution providing, upon the submission to the electors of the state of an amendment, that, "if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution." The consideration given to the law on this subject by Justice

Baker, of that court, and the thoroughness with which he has treated the entire general question, justifies us in our judgment in quoting at length from his learned opinion. He states:

"Where a question is required to be submitted at a certain general election, and is made to depend upon a majority of the votes cast at 'such election,' a majority of all the votes cast at the election is meant, and not merely a majority of the votes cast on that particular question. The conclusion at which we have arrived is sustained, in our opinion, by the overwhelming weight of authority. The following decisions are directly in point: (Cases cited from California, Illinois, Kentucky, Michigan, Minnesota, Mississippi, Missouri, Nebraska, and Ohio). And see *Sanford v. Prentice,* 28 Wis. 358, on the difference between an elector and a voter. In *People v. Town of Berkley,* 102 Cal. 298, 36 Pac. 591, 23 L. R. A. 838, the court said of a constitutional provision: 'These words (whenever a majority of the electors voting at a general election shall so determine) clearly do not indicate that only a majority of the electors voting upon the proposition is necessary, but would seem to imply that a majority of all those voting at the election is required.' In *People v. Brown,* 11 Ill. 478, the Constitution provided: 'Whenever a majority of the voters of such county, at any general election, shall so determine.' The court held: 'It does not mean a majority of those voting on the question submitted, but a majority of all the legal voters of the county.' In *People v. Wiant,* 48 Ill. 263, the language of the Constitution under consideration was 'a majority of the voters.' Held, that a majority of the votes cast on the question was insufficient. In *Stebbins v. Judge,* 108 Mich. 693, 66 N. W. 594, the statute forbade the incurrence of bonded indebtedness 'unless the qualified voters of said city, voting in their respective wards, shall have authorized the issuing of said bonds by a majority of their votes cast at any regular election or at a special election called for the purpose of voting upon such question.' The vote in question was taken at a regular election. Held, that the decision was determinable by a majority of the votes cast upon the question. In *Bayard v. Klinge,* 16 Minn. 249 (Gil. 221), the words of the Constitution under examination were 'a majority of such electors.' The court decided that a majority of those voting on the question was not sufficient. In *Slingerland v. Norton,* 59 Minn. 351, 61 N. W. 322, and in *Smith v. Board,* 64 Minn. 16, 65 N. W. 956, it was held

that the whole number voting at an election must be determined from the poll lists, not from the return of the votes counted as effective. The language of the Constitution under consideration in *State v. Powell,* 77 Miss. 543, 27 South. 927, 48 L. R. A. 652, was 'a majority, of the qualified electors voting.' It was held that the proposed constitutional amendment could only be adopted by a majority of those voting at the same time for any purpose. In *State v. Winkelmeier,* 35 Mo. 103, the language of the statute was 'a majority of the legal voters.' More than 13,000 voters participated in the election, 5,035 favored, and 2,001 opposed, the adoption of the question submitted. The court said: 'It is evident that the vote of 5,000 out of 13,000 voters is not the vote of a majority, and under the act quoted no authority was given the city.' In *State v. Babcock,* 17 Neb. 188, 22 N. W. 372, the Constitution provided that 'proposed amendments shall be published for three months preceding the next election of senators and representatives, * * * and if a majority of the electors voting at such election adopt,' etc. Held, that a majority of those voting on the amendment was insufficient. In *State v. Bechel,* 22 Neb. 158, 34 N. W. 342, the Constitution provided: 'No such general law shall be passed by the Legislature, granting the right to construct and operate a street railroad within any city, town, or incorporated village, without first requiring the consent of a majority of the electors thereof.' The question of having a street railroad was submitted at a general city election, at which 3,146 voters participated, of whom 1,650 voted for and 1,470 against the railroad. The court said: 'It is impossible for us, by any system of logical reasoning, to say that the election held in the city of Omaha on the 3d day of May, 1887, was other than one election. * * * That being the case, * * * the consent of a majority of the electors was not given.' In *State v. Foraker,* 46 Ohio St. 677, 23 N. E. 491, 6 L. R. A. 422, the constitutional provision was that a proposed amendment should be published 'for six months preceding the next election for Senators and Representatives (at which time the same shall be submitted to the electors, * * * and if a majority of the electors voting at such election shall adopt,' etc. Held, that a majority of those voting on the amendment was insufficient.

"'There are many other cases that are in harmony with our conclusions, but in which the constitutional or statutory provision under consideration was found, as in our own case of *City of*

*South Bend v. Lewis,* 138 Ind. 512, 37 N. E. 986, to condition the adoption of a particular question only upon its receiving a majority of the votes cast for and against it. (Citing cases from Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Nebraska, New York, North Carolina, North Dakota, Oregon, Tennessee, West Virginia, Wisconsin, United States Supreme Court, and federal courts.)  In the great majority of these the principles that control us in our holding in the present case are distinctly recognized. For example: *In re County Seat of Linn County,* 15 Kan. 500, the phrase 'a majority of the electors of the county was considered in connection with the returns of a special election at which the particular question' was the only matter to be voted upon. Mr. Justice Brewer, in speaking for the court, said: 'We do not doubt the restricting power of the constitutional provision; and whenever, by any of the ordinary or prescribed means of ascertaining the fact, it appears that a majority of the electors have not consented to the change, no change can be had.  *  *  *'  In 'cases where two or more questions are submitted at the same election, and more votes are cast upon one question than upon another, * * * the highest number of votes cast upon any one question is clearly evidence of the number of votes, which may not, in view of any such constitutional restriction as above quoted, be disregarded in any contest arising as to the decision of the other questions.' There may be a few cases that cannot be reconciled with the great weight of the decided law, but they probably all belong to the class of which *Gillespie v. Palmer,* 20 Wis. 544, may be taken as illustrative."

Among the authorities to which we have been referred by the defendants, are several which are cited in the Indiana case just quoted, and are clearly distinguishable from the principle involved in the case at bar, as the discussion contained in that case shows.

One of the first cases presented to us for our consideration by counsel for defendant in their brief is the case of *Gillespie v. Palmer et al.,* 20 Wis. 544, which is the same case mentioned in the closing paragraph of the quotation above given.  That was a case which grew out of a submission of an amendment to the Constitution of the state of Wisconsin, under which it was intended to extend the privilege of the franchise to colored persons. The provision of the Constitution providing for its amendments required

the proposition to be "submitted to the vote of the people at a general election, and approved by a majority of all the votes cast at such election." The court held that this language was susceptible to the construction that the amendment would become a law when it had been approved by a majority of the votes cast upon that subject, and counsel for defendant argue from this that this would necessarily be construing this language to mean that only those votes counted were in fact cast upon that subject. This decision is against the weight of authority, in the United States, and was subsequently criticized in the case of *Sawyer v. Dodge County Mutual Insurance Company,* 37 Wis. 503-534, where the court stated that it had been subjected to the criticism that the court decided it in accordance with "the logic of war" rather than the "logic of the law," and in a later case, *Bound v. Wisconsin Central Railroad Company,* 45 Wis. 543, Mr. Chief Justice Ryan, speaking of the decision, then being rendered by the court, and not agreeing on one proposition decided, said:

"I deplore the decision on this point; not merely because I think it wrong, but because I am apprehensive that it will be classed with such cases as * * * *Gillespie v. Palmer,* 20 Wis. 544, which have long been made a reproach to the court, as judgments proceeding upon policy rather than principle."

It will thus be seen that this authority, if not overruled, is at least to some extent discredited by the Supreme Court of the State where rendered. It can hardly be said to be in point anyhow.

The next case to which counsel directs our attention is that of *People v. Clute,* 50 N. Y. 451, 10 Am. Rep. 508. This was a case in which one Furman and Clute were candidates in one of the counties in the state of New York for the office of superintendent of the poor. Clute received a majority of the votes; Furman contested him on the ground that he was not eligible, taking the position that, because of the ineligibility of his rival, he alone had received a majority of the legal votes cast, and was entitled to the office; and the court, discussing this theory in the

light of these facts, gave utterance to the following, which was quoted by counsel for defendant as sustaining their contention under the facts presented in this case:

"It is the theory and the general practice of our government that the candidate who had but a minority of the legal votes cast does not become a duly elected officer. But it is also the theory and pratice of our government that a minority of the whole body of qualified electors may elect to an office, when a majority of that body refuse or decline to vote for any one for that office. Those of them who are absent from the polls, in theory and practical results are assumed to assent to the action of those who go to the polls; and those who go to the polls, and who do not vote for any candidate for an office, are bound by the result of the action of those who do; and those who go to the polls and who vote for a person for an office, if for any valid reason their votes are as if no votes, they also are bound by the result of the action of those whose votes are valid and of effect. As if, in voting for an office to which one only can be elected, two are voted for, and their names appear together on the ballot, the ballot so far is lost. The votes are as if for a dead man or for no man. They are thrown away; and those who cast them are to be held as intending to throw them away, and not to vote for any person capable of the office. And then he who receives the highest number of earnest valid ballots is the one chosen to the office."

When the facts and situation under which this discussion was made are taken into consideration, we believe that it will then be clearly apparent that it is not referable to the proposition now before this court. The court follows this by saying that: "They who, knowing that a person is ineligible to office by reason of any disqualification, persistently give their ballots for him, do throw away their votes, and are to be held as meaning not to vote for any one for that office;" and the court held in the syllabus that:

"A minority of the whole body of qualified electors may elect to an office where the majority decline to vote, or where they vote for one who is ineligible to the office, knowing of the disqualification. Notice of the disqualifying fact, and of its legal effect, may be given so directly to the voter as to charge him with actual knowledge of the disqualification; or the disqualifying fact may be so patent or notorious as that his knowledge of the ineligibility

may be presumed as matter of law. But not only the fact which disqualifies, but also the rule or enactment of law which makes it thus effectual, must be brought home so clearly to the knowledge or notice of the elector as that to give his vote therewith indicates an intent to waste it in order to render his vote a nullity. Where a majority of the electors, through ignorance of the law or the fact vote for one ineligible to the office, the votes are not nullities; but while they fail to elect, the office cannot be given to the qualified person having the next highest number of votes. The election is a failure, and a new election must be had."

The next case to which counsel calls our attention is that of *Rushville Gas Company v. City of Rushville*, 121 Ind. 206, 23 N. E. 73, 6 L. R. A. 315, 16 Am. St. Rep. 388, which was one wherein it was held that the majority of the quorum of a city council may act and legally adopt a resolution although the entire council may be present, some of them refusing to vote. To practically the same effect are the cases also cited by counsel for defendant: *State ex rel. v. Green*, 37 Ohio St. 227; *Murdock v. Strange*, 99 Md. 89, 57 Atl. 628; 3 Am. &. Eng. Ann. Cas. 66. A statement of the facts of these cases we regard as sufficient to show their lack of applicability to aid us in construing this section of our Constitution, or to aid us in determining whether the phrase "votes cast" means votes counted or ballots cast.

The case of *State v. Wurts*, 63 N. J. Law, 289, 43 Atl. 744 881, 45 L. R. A. 251, was one wherein the Legislature of New Jersey, having regularly agreed to three proposed amendments to their Constitution, one of which related to lotteries, another to appointment to office, and another to woman suffrage, provided by an act for the submission thereof to the people of the state. The Constitution provided that it might be amended "by a majority of the electors qualified to vote for members of the Legislature voting thereon." The question was upon whether or not the lottery amendment received the constitutional number of votes. The Court of Errors and Appeals, to whose decision counsel cites us, held in the syllabus:

"In determining whether a proposed constitutional amendment

was approved and ratified by 'a majority of the electors qualified to vote for members of the Legislature voting thereon' only those electors who lawfully vote for or against the amendment are to be considered."

The facts on which the case was decided, and the law applied thereto, shows at once that it is within that class of cases discussed so ably by the Supreme Court of Indiana, in *Re Denny, supra*. The following excerpt from the opinion, in which is stated the facts upon which the decision is based, sufficiently distinguishes it from the case at hand, to demonstrate its lack of applicability to our question:

"The first claim of the prosecutors deserving attention is that, according to the statement of the result of the voting made by the board of state canvassers, the lottery amendment was not approved and ratified by the requisite majority of electors, and therefore the board's determination that it had been adopted was illegal. By that statement it appears that the number of names on the poll list was 141,672, that the number of ballots rejected was 961, that the number of votes given for the lottery amendment was 70,443, and the number of votes given against it was 69,642. The prosecutors insist that a majority of all the votes, as shown by the names on the poll lists, or at least a majority of all those who cast ballots, whether the ballots were for or against any amendment, or were rejected, was necessary for adoption. Its words are, 'a majority of the electors qualified to vote for members of the Legislature voting thereon,' and in the following clause it speaks of those voting 'for or against each amendment.' Evidently only those voting for or against an amendment are to be deemed those voting thereon. By the words, 'electors voting thereon,' are intended the electors who exercise the right of suffrage in such manner that their votes should, under the law, be counted for or against the proposition submitted; and although the number of names on the poll lists may represent the number of qualified electors who attempted to vote, and the rejected ballots may, all have been official ballots cast by some of those qualified electors, still it may be that not all of those qualified electors voted in the constitutional sense, and that the rejected ballots were not votes. If, for example, an elector presented to the election officer, and the officer deposited in the ballot box, two or more official ballots,

rolled or folded together, and in canvassing the votes the ballots were so found, these ballots would under the law, be null and void, and the elector would not have voted on any of the amendments. Now, in the absence of evidence to the contrary, the presumption is that the election officers acted rightly, and therefore that the rejected ballots were rejected for legal cause and were not votes for or against any amendment, that all the votes legally capable of being counted for or against the lottery amendment were 140,085, and that only so many qualified electors voted thereon, of whom a majority approved and ratified it. It is deemed useless to refer to decisions elsewhere enforcing a different method of computation, because they turn on different language in the Constitution. The meaning of our own Constitution seems plain."

The same case received the consideration of the Supreme Court of New Jersey, under the title of *Bott v. Secretary of State,* 62 N. J. Law, 107-128, 40 Atl. 740. In the discussion of the case before that court, the learned Justice Depue, who wrote the opinion of the court, in the consideration of the same took occasion to mark clearly the distinction between a case of that character and one wherein the question of the vote required to remove a county seat was involved. He furthermore shows and makes manifest the reason why, in considering the votes cast on the constitutional amendment submitted, those only which could be counted for or against, could be taken into consideration. He said:

"To sustain the contention that, in the determination of the board of state canvassers, the number of names on the poll books, which include the votes given for and against each proposed amendment, as well as the number of ballots rejected should be considered in ascertaining the majority, *Slingerland v. Norton,* 59 Minn. 351, 61 N. W. 333, and *Smith v. Board of Commissioners of Renville County,* 64 Minn. 16, 65 N. W. 936, were cited. These decisions were made upon a statute submitting to an election the question of the removal of county seats, which provided that 'if fifty-five per cent. of the votes cast at such election shall be in favor of changing the county seat to the place named' the change shall be made. The court, on a construction of the words 'votes cast,' held that the majority was to be ascertained from all the ballots that were cast at the election,

although some of the ballots could not be deciphered or counted either for or against the proposed change of the county seat. Decisions of which the cases cited are types have no relevancy to the construction of our Constitution. The constitutional provision does not require a majority of the voters who are admitted as such at the election, and who in fact exercise or attempt to exercise the elective franchise. The certificate of the number of votes received by the several election boards is presumptive evidence that the persons by whom they were cast were qualified voters. But that concession does not dispose of this question. The Constitution requires that the approval and ratification of any amendment shall be by a majority of electors who are not only qualified to vote, but who did actually vote upon such amendment; that is, qualified voters whose ballots were entitled by law to be counted in declaring the result of the election either for or against the amendment. Though a qualified voter succeeds in getting his name on the poll-list and a ballot in the ballot box, he is not a voter voting on the amendments unless his ballot is such as is prescribed by law and conforms to the general law regulating elections. The act contains no provision for the certificate and return of the ballots that were rejected, nor does it provide for an inquiry either before the county boards of election or before the board of state canvassers with respect to the grounds upon which votes have been rejected, nor are either of these boards empowered to embody in their official action any results other than such as are exhibited by the official statements produced before them. The ballots returned as rejected must be taken to have been properly rejected, and consequently are to be excluded from the computation of the votes cast for or against the amendments. Such ballots were simply nullities."

Thus the case is distinguishable and distinguished from the case at bar by the language of the law under which it was held, and by the additional fact that, under the law controlling in that case, mutilated ballots could not be considered as "votes cast," for the reason that they were not preserved and returned, while under the special election law of Oklahoma all mutilated ballots are properly preserved for the consideration of the courts.

Another case to which our attention is called is likewise from the Supreme Court of New Jersey, *State ex rel. Lane v. Otis*, 68

N. J. Law, 64, 52 Atl. 305. The facts of the case are stated by the court as follows:

"The office in dispute is that of member of the board of chosen freeholders of the county of Ocean for the township of Little Egg Harbor. The borough of Tuckerton having been set off from the township, there were, at the time this election was held, two election districts, viz., the borough of Tuckerton and the township of Little Egg Harbor, that lay outside the borough. At the election held upon March 12, 1901, the electors of each of these districts cast their ballots for member of the board of chosen freeholders at polling places situated within the territorial limits of the borough of Tuckerton. This circumstance gives rise to the main subject of contest between the parties to this proceeding. The contention of the relator is that the ballots cast by the electors who resided in that part of the township that lay outside the borough are not, in legal effect, votes cast at the election, and hence cannot be counted."

The court, on these facts, in its syllabus held:

"Section 69 of an act to regulate elections (Revision, P. L. 1898, p. 237) is mandatory in character. It not only makes it illegal for an elector to vote elsewhere than in his own district, but also makes his title to vote dependent upon the exercise of that right within the election district in which he actually resides. The effect of a vote illegally cast is that, in legal effect, no vote has been cast. In determining what shall constitute a majority of votes at an election, those ballots only that are in legal effect votes are to be considered."

It will thus be seen that the only thing this case decides is that those who lived outside the election district were not entitled to have their votes counted for any purpose.

Our Constitution provides that the county seats established by it "shall be and remain the county seats of their respective counties until changed by vote of the qualified electors of such county." Now, we suppose no one would contend that, if a number of individuals living in another county than McIntosh had gone into it and voted in this election, their votes should be counted for any purpose. They would do palpable fraud upon the election. They would not be qualified electors as required by the

Constitution, and a court, if such a question should arise, would doubtless so hold; in fact, that is just what the New Jersey court held in the case to which we have last referred.

The facts in the case of the *County Seat of Osage County*, 16 Kan. 296, to which we are referred by counsel for Checotah, are stated in the syllabus as follows:

"At an election held for the purpose of relocating the county seat of Osage county, Burlingame, the existing county seat, received no votes; Lyndon received 883; Osage City, 791; and Shireton, 785 votes. No place having received a majority, a second election was ordered, as prescribed by the statute, and the voting restricted to the two places receiving the highest votes, Lyndon and Osage City. At the second election, notwithstanding such restriction, votes were cast for Shireton, and the result was that Lyndon received 1,131, Osage City 1,049, and Shireton 298 votes. Though Lyndon did not then receive a majority of the votes cast, the commissioners rejected the votes for Shireton, and declared Lyndon the duly and legally-selected county seat. Held, that there was no error in such ruling and decision."

The county seat law of Kansas was much the same as that of Oklahoma; a portion of the opinion rendered in the case reads as follows:

"Chapter 26 of the General Statutes, the act providing for the location and removal of county seats, in its seventh section reads: 'If no place receives a majority of all the votes cast, a second election shall be held, * * * and at such election the balloting shall be confined to the two places having received the highest number of votes at the preceding election.' But the specific objection is that such a result thus obtained involves a disregard of section 1 of article 9 of the Constitution, which declares that 'no county seat shall be changed without the consent of a majority of the electors of the county.' "

At the time of the election for a change of the county seat, the same was located at Burlingame. It will be noted that the statute provides that if, on a first election, "no place receives a majority, of the 'votes cast,' a second election shall be held," and the Constitution provides that "no county seat shall be changed without the consent of a majority of the electors of the county."

None of the "votes cast" were for leaving the county seat at Burlingame; all of the votes which were cast were for changing. Hence the Constitution was satisfied by the election. On the second election, as is seen, neither Lyndon nor Osage City received a majority of the ballots cast at the election, but Osage city did receive a majority of all of the "votes cast" that were delivered on the proposition then before the voters for consideration. The 298 votes cast for Shireton, so far as the controversy before the electors was concerned, were blank ballots. They may just as well have been cast for some town outside of the county and impossible of becoming the county seat as to have been cast for some town inside the county which was not a candidate. They manifested nothing unless it was a willingness that those who voted upon the candidates that were properly running might select, and a waiver on their part of any right or desire to participate in a choice between them.

The case of *Davis v. Brown,* 46 W. Va. 716, 34 S. E. 839, also comes within the class of cases such as are dealt with by the Indiana Supreme Court in the case of *In re Denny, supra.* It is a case wherein the relocation of a county seat was involved, which election was held at the time a vote was taken at a general election for public officers. The statute of West Virginia provides that "three-fifths of all the votes cast at said election *upon the question*" were sufficient to relocate the county seat, and that in such an election this result was effected when three-fifths of all the votes cast upon the question of the relocation of a county seat were in the affirmative, and that three-fifths of the votes cast on other questions or for candidates for office was not required. The statement of the case is confusing on the proposition of a certain questioned 312 votes, which the court says "were cast but were not marked, or so marked as not to indicate the voter's choice; and the county court held that those 312, though not countable for or against either place competing for the county seat, must yet be

counted as votes in ascertaining the aggregate vote." In speaking of these same votes again, the court says:

"In this case 312 voters actually came to the polls and participated in the election by voting for Congressman and other officers, but did not vote upon the county seat question, and thus we know by the record of the election, without extrinsic evidence, that these voters exist. The ballots had on them, as required by chapter 31, p. 51, Act 1895, the words 'For Relocation of County Seat of Elkins,' and 'Against Relocation of County Seat,' and these voters either did not erase one and retain the other expression, or so marked their ballots touching this question as not with legal certainty to express a choice. The record does not show what number were defective for this cause, what number for that. Now, if our statute had said that a relocation should demand three-fifths of the 'voters' or 'qualified voters of the county' or 'of the votes cast,' or even 'of the votes cast for the purpose,' perhaps the weight of authority would say that these 312 votes must be included in making up the aggregate dividend to be fractioned to get the three-fifths."

The court then, after citing and quoting from a number of cases involving the construction of the language of statutes and Constitutions of other states, wherein there was distinguished between those which required a majority of votes cast upon the particular question then presented, or a majority of the votes cast at the election, said, in reference to these two propositions:

"One theory is that, when a majority of qualified voters is required, and we know from the election record that a certain number of voters were present, participating in the election, we should require a majority of all to adopt the measure. The other theory is that those present, but not voting on the question, are dumb upon it, without active preference, without choice, assenting to what those who do speak shall do, like those who do not at all approach the polls; even more so, because present and silent. We do not, because we need not, decide which of these theories is right. We decide this case on the particular language of our statute, which says that, 'if three-fifths of all votes cast at said election upon the question be in favor of the relocation,' such relocation shall take place. Now, we are asked to strike out the words, 'upon the question.' This would violate the legislative design. It has iso-

lated and specialized this particular election from the election for other purposes; made it, in effect, a special election for that alone. It has made it just the same as one between two candidates for office. Beverly and Elkins were simply two candidates for the choice of those who chose to vote between them."

The court states in its opinion that the "pivot of the case," in a general election where a special question is submitted, "where the law only requires a 'majority of those voting thereon' or 'on the question,' or the like, votes as to the candidates are utterly irrelevant." It will thus be seen that "the pivot" was not in the determination of whether ballots from which it was not possible to determine how the voter voted upon the question was primarily before it, but the question as to whether votes cast for candidates voted for at the same election should be considered as "votes cast" upon the question. This is seen from the first paragraph of the syllabus, which is the only syllabus on the proposition, which reads as follows:

"In a vote, at a general election for public officers, upon the relocation of a county seat, under chapter 31, p. 51, Acts 1895, requiring for relocation 'three-fifths of all the votes cast at said election upon the question,' such relocation is carried if it receive only three-fifths of all the votes cast on that one question, though they are less than three-fifths of the votes cast on some other question, or for candidates for office."

So that it will be seen that the question which is squarely presented by the facts in the case at bar received but a casual consideration at the hands of the West Virginia court in the decision of that case, as it was not involved nor necessary for decision.

The foregoing cover practically all of the leading cases relied upon by counsel for the defendant to sustain their position that the phrase "a majority of all the votes cast" means a majority of the votes counted. We have made an exhaustive and thorough investigation to ascertain if there were additional authority to sustain this position, and we confess that counsel in their zeal and diligence have brought to the attention of the court practically all of the decided cases which by argument or construction

could be argued as sustaining their position. It is likewise true that there are but few cases to be found wherein this question has been passed upon and decided by courts of last resort of the country, but we believe that, where this has taken place, the holding of that court has been in consonance with the conclusion we have reached, which is that, in a special election called for the purpose of relocating a county seat under a Constitution or statute which provides that the successful contestant shall receive "a majority of the votes cast," this should be so construed as to require a majority of all the valid legal ballots cast upon the question, intelligible as well as unintelligible, and to effect a removal that it must be made to affirmatively appear that a majority of this number were cast in favor thereof. *Smith v. Board of Commissioners of Renville County*, 64 Minn. 16, 65 N. W. 956; *Hopkins v. City of Duluth*, 81 Minn. 189, 83 N. W. 536; *State ex rel. Phelan v. Walsh*, 62 Conn. 260, 25 Atl. 1, 17 L. R. A. 364; *State ex rel. Hocknell v. Roper*, 46 Neb. 724, 61 N. W. 753.

The case of *Smith v. Board of Commissioners, supra*, the leading case on the subject referred to and cited by many courts, was one wherein Beaver Falls and Olivia, in the county of Renville, were contestants for county seat. The statute of that state reads: "And if fifty-five per cent. of the votes cast at such election shall be in favor of changing the county seat," etc., it is deemed changed. The facts on which the decision turned were stated by the court as follows:

"According to the findings, 2,319 votes were cast in favor of the removal, while 1,780 votes were cast in opposition, and there were deposited in the ballot boxes, presumably by legal voters, 68 ballots from which it was impossible to ascertain whether the depositors intended to vote for or against removal; that is, 68 legal voters had endeavored to give expression to their views at this special election, but had failed to do so in a manner intelligible to the trial court. And, in passing, it may be remarked that, while the court below found but 68 of these unintelligible ballots, the town boards and the board of county commissioners,

when canvassing the votes, had much more difficulty, for not less than 20 ballots rejected by these boards as unintelligible and defective were held by the trial court to sufficiently indicate the voter's choice. It is urged in behalf of the contestant that, in determining whether 55 per cent. of the votes cast at the election were in favor of a change of county seat, these 68 ballots, rejected by the court as unintelligible, must be taken into consideration as a part of the total vote cast; and, if this be so, it stands admitted that the requisite percentage of votes was not obtained, and the removal proposition did not carry."

By the foregoing it is seen that the identical question presented to this court was likewise presented to the Supreme Court of the state of Minnesota in that case, and on this the court held in the syllabus as follows:

"For the purpose of determining the number of 'votes cast' at an election held under the county seat removal act of 1889 (Gen. St. 1894, § 647 et seq.), all of the ballots cast, unintelligible as well as intelligible, must be considered; and, to effect a removal, it must affirmatively appear that at least 55 per cent. of all votes or ballots cast were in favor thereof. At the election in question, 2,319 votes were cast in favor of removal, 1,780 votes against removal, and 68 votes or ballots were deposited in the ballot boxes, presumably by legal voters, from which it was impossible to ascertain whether the voters intended to vote for or against removal. Held, that the requisite 55 per cent. of the 'votes cast' was not obtained."

The statute of Minnesota, providing for the preliminary petition on which might be called an election for voting upon the location of a county seat, required 60 per cent. of the whole number of voters who cast their ballots at the preceding election, while the section of the Constitution under which we are operating requires a petition in writing signed by 25 per cent. of the qualified electors of the county, to be determined by the total vote cast in such county for the head of the state ticket in the next preceding election. Aside from this and the method provided for the canvass of the votes, there is but little actual substantial difference in the two laws, the one construed in that case, and the one for our construction in this one. The court, in its con-

sideration of the case, in support of the first paragraph of the syllabus, presented the following reasons, which we regard as equally applicable to the conditions existing in this case:

"From the whole tenor of the act, it seems apparent that no distinction was attempted to be made between 'ballots' and 'votes,' and that the technical difference between 'ballots cast' and 'votes cast' was not in mind; between voters who expressed their choice on the proposition so intelligently as to leave no uncertainty in the minds of those who composed the town canvassing boards or the county board, or in the mind of the court before which a contest might be brought for trial, and voters who, in attempting to express such choice, were less fortunate than their neighbors. If we do not take this view of the act, serious complications might arise, adding to the turmoil which usually attends an election of this character. A town canvassing board might decide one ballot unintelligible, and thus be able to have it appear *prima facie* that the proposition for a removal had received the necessary majority; while the county canvassing board might hold this same ballot intelligible, or against the proposition, thus defeating it; while the trial court might reverse the conclusion of the county board, either by taking a different view of the intention of the voter who cast this ballot, or by concluding that his intention or choice was not ascertainable from the ballot. Again, if this construction is not placed upon the act, it might easily happen that a minority of the legal voters of the county who attended the polls for the sole purpose of expressing their views upon a very important measure, who attempted so to do by depositing their ballots, whose names appeared upon the poll lists and in the returns as having voted, and who are regarded for every other purpose as having voted at the election, might cause the removal of a county seat, and thus overcome the unmistakable design of the removal act. Such a construction, so opposed to the intent and spirit of the law, should not obtain if it can reasonably be avoided."

Counsel for defendant take the position that the force of this case was virtually broken by the Supreme Court of Minnesota in its decision of the case of *Hopkins v. City of Duluth, supra.* In our judgment the language and the reasoning of the court in that case is not susceptible to the construction sought to be placed up-

on it. That case was an election contest over the new city charter of the city of Duluth. At the election, four distinct subjects were submitted upon a single ballot to the voters of that city. Three candidates for mayor, two for alderman, and other propositions were voted upon. The law required four-sevenths of the qualified voters voting at such election to be cast in favor of the charter in order that it receive the requisite number of votes to secure its ratification. In considering the question as to what ballots should be counted in making up the whole number upon which the four-sevenths should be estimated, the court held:

"Fraudulent ballots, ballots with unintelligible marks, expressing no effective vote upon any subject of choice, as well as ballots upon which no markings have been made by the voter, should be excluded from the aggregate number upon which the requisite four-sevenths required by the constitutional amendment is to be estimated in determining the ratification of the proposed charter."

There were 26 ballots which came within the description of fraudulent ballots, ballots which were unintelligible, and ballots with no markings. Five of them had the names or initials of the voters casting them written thereon, which the court held was a plain and palpable fraud upon the election law. Fifteen expressed no choice upon the ratification of the charter, and six ballots were totally blank. In other words, there were twenty-one ballots excluded which were blank so far as the charter proposition was concerned, and five which were excluded for fraud. In the face of this situation, the contestee urged that these ballots should have been counted by the court in making up the total number of votes cast, and cited in support of this contention the case of *Smith v. Board of County Com'rs of Renville County, supra,* and the court in the consideration of that case distinguished it from the one then before it, in the following language:

"The contest in that case was upon the change of a county seat, which must in all cases be at a special election, and the removal must be carried, under the express terms of the statute, by '55 per cent. of the votes cast.' In that case it was held, for reasons that were peculiar to the character of such a contest that

the necessary safeguards which the statute relating thereto, in its various provisions, requires, 'to prevent a county seat from becoming a mere football, to be frequently kicked from one place to another by caprice,' and 'to give to the existing county seat some degree of permanence,' demanded a strict construction of the language of the statute designating the majority by which the removal should be carried. The entire opinion of the court is permeated with this view, and expresses several substantial reasons why a different rule might obtain in such a case, other than applied in *Dayton v. City of St. Paul,* 22 Minn. 400, where it was held that 'ordinarily, in voting for a candidate or for or against a proposition which is to be adopted or rejected, the votes to be counted on either side should be those cast for or against such candidate or for or against such proposition.' The whole tenor of the county seat removal statute was held to show 'a clear design to prevent frequent changes or any change at the behest of a mere majority,' and the statutory requirements, from the institution of proceedings for the removal of the county seat, to the final count of the votes, are reviewed in the opinion of the court with great care to show that the intent of the Legislature, to safeguard the rights of existing county seats, and to prevent danger from efforts to change them, required a strict construction of the language providing that '55 per cent. of the votes cast' is necessary to effect such removal; and the practical result is reached that it was within the legislative intent, in view of all the provisions of the removal law, and the words 'votes cast' were used as the equivalent of 'ballots cast,' and the reasoning of the court fully justified that conclusion.   *   *   *

"But there is still a more significant reason for our view, by a comparison of the language providing for the final count in county seat contests and upon the ratification of municipal charters. In a county seat removal 'fifty-five per cent. of the votes cast' are needed to secure the change, but for the ratification of a charter 'four-sevenths of the qualified voters voting at such election' shall be sufficient. The word 'votes,' in the Ranville County Seat Case, was treated as equivalent to 'ballots.' It does not seem reasonable to apply a similar test to the words of the amendment, 'qualified voters voting at the election.' To do so would be to hold that any person who had passed into the voting booth and whose name had been checked up on the poll list had voted, though he had expressed no choice for any one, or upon any ques-

tion or proposition, and would give to a bare attempt on his part to vote, or to a fraudulent vote, a substantial effect, as much as if the voter had voted, when he had not voted at all. We cannot go to this extent."

Another case in which a similar, although not the exact, view is taken on this proposition, is the case of *State ex rel. Phelan v. Walsh* (from the Supreme Court of Connecticut) 62 Conn. 260, 25 Atl. 1, 17 L. R. A. 364. This case presented a contest between several state officers, the question presented to the court being which of these officers had received a majority of the votes cast. On this proposition the court held:

"In determining whether any candidate for a certain state office received a majority of the votes cast, where this is necessary to an election, ballots for the general state officers rejected, without stating specifically in a certificate the reason therefor as required by statute, will be counted in making up the whole number of votes cast, although it does not appear whether they contained the name of any candidate for the particular office in question."

In the discussion of the same, the court said:

"It appears from the statutory returns that there were eleven ballots in the town of Branford, and one ballot in each of the towns of Hartford and Middletown, which were rejected, and the reason for such rejection does not appear in the returns of the presiding officer, and did not appear in the evidence before the court. Nor was any evidence offered to show that either candidate's name for secretary was upon any of the ballots so rejected. The court, therefore, held that such ballots could not be considered for the purpose of affecting the count of the votes for secretary. If by this is meant that those votes could not be counted for either candidate, the course taken was manifestly correct. But if we are to understand, as we think we must, that those votes were not regarded in making up the whole number of votes cast, it is not so clear that it was right. Under a plurality rule, it is material only to count the votes of the two highest candidates. All scattering votes are practically disregarded. Under the majority rule, all scattering votes are important and must be counted."

Section 1, art. 3, c. 17, Comp. St. Neb. 1893, provides that,

where an election is held for the purpose of locating a county seat of a county, "any place receiving three-fifths of all the votes cast shall become and remain the county seat of said county." On the 1st day of August, 1892, an election was held in Red Willow county of that state to determine which of two places, Indianola or McCook, should be declared the county seat. At this election in addition to the ballots which were cast and counted for the contesting towns, there were three blank ballots cast, one ballot rejected, two ballots distinguished and not counted, and twenty-five electors registered as voting and whose ballots were unaccounted for. In reference to this, under a law which is practically the same as ours, the court in the discussion of the case (*State ex rel. Hocknell v. Roper*, 46 Neb. 734, 61 N. W. 753) said:

"The meaning of the law is that a county seat of a county shall not be relocated at any place unless three-fifths of all the electors of the county shall express their will to that effect by their votes at an election held for that purpose; and the law presumes that, when such an election is held, all the electors of the county vote at such election. The votes cast for Indianola and for McCook, the 3 blank ballots cast, the 1 ballot rejected, and the 2 ballots written for McCook and not counted, do not constitute the entire vote cast. There were on the pollbooks of the various voting places recorded as voting the names of 2,237 electors. The votes of all these electors are accounted for, except 25. But as the 25 electors registered as voting, we must presume they voted either blank ballots, or for some place other than either McCook or Indianola. Those ballots, though unaccounted for, constitute a part of the 'whole vote cast,' within the meaning of the statute."

It will be noted that while the different cases to which we have called attention, where the question was involved as to what should be included in making up the total where a majority of votes cast on the proposition was required to carry it, hold that mutilated ballots—that is, unintelligible ballots, those which show an effort on the part of a qualified elector to exercise his lawful right of franchise—should be counted, there are in some instances a flat contradiction and difference of opinion among them as to whether or not ballots on which the voter has written his name or on which

he has placed some distinguishing mark, manifesting a fraudulent intent to distinguish the ballot, and those ballots which are cast blank, should be counted. In a special election to locate a county seat, under our Constitution, where all the ballots are preserved, both those which are counted for the different contestants as well as those which the election officials refuse to count for any one of the statutory reasons, or on any account, we are of the opinion that on the better reason as well as authority, fraudulent, distinguished ballots, illegal ballots, such as those cast by parties not qualified, and blank ballots, should not be counted, in making up the whole number of votes cast. *Hopkins v. City of Duluth,* 81 Minn. 189, 83 N. W. 536; *Murdoch v. Strange,* 99 Md. 89, 57 Atl. 628, 3 Am. & Eng. Ann. Cas. 66; *State ex rel. Lane v. Otis,* 68 N. J. Law, 64, 52 Atl. 305; *County Seat of Osage County,* 16 Kan. 296. Clearly the efforts of those who seek to perpetrate a fraud upon the election, or use the election for fraudulent purposes of their own, ought not receive any recognition at the hands of those who are charged with seeing that the same is fairly held and a correct result ascertained and declared. Neither should those who go to the polls which are opened for the purpose of holding an election, and who take no part therein, further than to go through the empty form of casting a ballot on which no choice is marked or indicated. The elector who casts a blank ballot manifests but one purpose and intention, which is to allow and permit those who do vote upon the proposition to determine it. So, in our judgment, the total to be considered, the whole number of votes cast upon which the majority is estimated, should be made up of those votes which are counted for the different propositions and those which have been cast by the qualified electors of the county making an honest though unintelligible effort to participate in the making of the choice. This conclusion in our judgment not only has sound reason and justice to support it, but also the weight of judicial expression of the courts of the United States where the same has been before them.

The selection of a permanent county seat for a county is a matter of great importance, not only to the different cities or localities competing, but also to the citizens of the whole county, and none of them should be deprived of their constitutional right of casting a ballot and having the same counted thereon, except where they are in some way at fault. The ballots held mutilated in the case at bar, and which were not counted by the referee, were made up practically altogether of those which clearly show that by accident or ignorance, and not design, they were unintelligible and could not for this reason properly be counted for either of the places. If a different rule than the one which we announce were to govern, then county seats might not be located in many instances by the deliberate choice of a majority of the qualified electors casting votes thereon, but by chance as a result of ignorance or accident, over which the electors exercised no control; for contests are often close, and a few votes either way often determine them, and clearly its place of location should not be determined by less than a majority of the ballots cast by the qualified electors making an honest effort to vote upon the proposition. Nearly all of the ballots over which counsel contend most strenuously were those which were stamped for one or the other of the towns, and then folded so that the ink became smeared and daubed until it was impossible to ascertain with any reasonable degree of certainty for which place the ballot was intended. Were we to declare the rule contended for by counsel for Checotah, it might often happen that very much less than a majority of the qualified electors of a county who attended the polls and cast legal ballots would determine the location of the county seat. This we do not believe to have been the intention of the framers of our Constitution, and we cannot so hold.

It therefore follows that the petition of the relator will be sustained and another election called by the proper authorities in McIntosh county, at which Eufaula and Checotah shall be the

participants, they having received the greatest number* of votes in the election just held.

Williams, C. J., and Hayes and Turner, JJ., concur; Kane, J., dissents.